**Vera NORWOOD, Plaintiff,**

v.

**DALE MAINTENANCE SYSTEM, INC. and Standard Oil Realty Corp., Inc., Defendants.**

**No. 82 C 5423.**

United States District Court, N.D. Illinois, E.D.

June 6, 1984.

James R. Potter, Kinoy, Taren, Geraghty & Potter, Chicago, Ill., for plaintiff.

S. Richard Pincus, Fox & Grove, Chtd., William J. Reifman, Mayer, Brown & Platt, William Ollie Ligon, Chicago, Ill., for defendants.

## ORDER

ROSZKOWSKI, District Judge.

This matter comes before the court for decision following a bench trial of plaintiff's claim of sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Jurisdiction is based upon 42 U.S.C. § 2000e–5(f) and 28 U.S.C. § 1343(4). For the reasons set forth herein, judgment is entered in favor of defendants.

## I. FINDINGS OF FACT

Plaintiff Vera Norwood ("Norwood") is a female who has been employed by defendant Dale Maintenance System, Inc. ("Dale") continuously since June 25, 1973. Dale is a corporation engaged in providing janitorial and maintenance services to clients on an independent contractor basis. Defendant Standard Oil Realty Corporation ("Standard Oil") is a corporation doing business in the State of Illinois. Standard Oil maintains offices at and owns and rents commercial office space in the Standard Oil Building in Chicago, Illinois. Dale has a contract with Standard Oil to provide janitorial and maintenance services in the Standard Oil Building. Norwood has never been employed directly by Standard Oil.

The Standard Oil Building is a multi-storied commercial building comprised of 82 floors with a daytime population of between 8,000 and 12,000 persons. Banks of elevators service the floors and provide access to specific ranges of floors in the building. In order to gain access to a specific floor, therefore, a person might have to transfer from one elevator bank to another at some point during their ascent or descent.

Each floor of the Standard Oil Building has one men's washroom and one women's washroom. On 24 of the floors of the building the washrooms are in restricted areas not accessible to the general public. Moreover, on many of the floors the doors to the washrooms are locked. Keys to the men's and women's washrooms on a specific floor are only issued to tenants on that floor.

Two males are assigned by Dale to the day shift to clean all male washrooms in the Standard Oil Building. One male day shift employee is assigned to clean twice daily the 33 male washrooms between the 34th and Lower Level 5 floors, plus to police the canteen on the 6th floor. One male day shift employee is assigned to clean twice daily the 42 male washrooms between the 35th and 82nd floors, plus to police the canteen on the 54th floor. One female day shift employee is assigned to clean twice daily the 32 female washrooms between the 34th and Lower Level 3 floors, plus to police the canteens on the 5th, 54th and 68th floors. One female day shift employee is assigned to clean twice daily the 43 female washrooms between the 35th and 82nd floors. Dale's day shift employees travel in teams of one male employee and one female employee, and each team travels simultaneously while inspecting and supplying the washrooms. All supplies are kept in a closet in the men's washrooms and the key to the supply closet is given only to the male employee of each team.

Day shift washroom attendants perform their duties according to predetermined schedules prepared by Dale. The schedules provide for the attendants to service the washrooms twice per shift. The schedules allot a total of five minutes for cleaning of and travel between each of the various washrooms. Dale's employees sometimes complete their washroom job duties in more or less than five minutes and then proceed to the next floor. Dale is generally able to identify the vicinity where its day shift employees are working at any given time. Dale is not always able, however, to identify the exact floor where the employees are working.

No major cleaning duties, such as sweeping, mopping or sanitizing of the washrooms, are performed during the 8:00 a.m. to 4:30 p.m. day shift. All of the major cleaning duties are performed during the 5:00 p.m. to 1:30 p.m. night shift. Dale does not assign its night shift employees to washroom cleaning duties on the basis of sex, and female night shift employees are issued keys for both men's and women's washrooms and for the supply cabinet in the men's washrooms. When it is necessary for a night shift employee to enter an opposite sex washroom he or she first knocks on the door. If a male washroom is in use during the night shift, a female employee may be able to begin cleaning duties in the female washroom on the same floor and in the offices until the male washroom is empty. At least three years ago, Standard Oil received a complaint from a

female tenant concerning a male employee entering a female washroom in the Standard Oil Building during the night shift without first knocking. Standard Oil responded to this report by requesting Dale to remind the employee to knock before entering any female washrooms. Nine floors in the Standard Oil Building regularly schedule employees to work after 5:00 p.m. Standard Oil estimates that only 80 individuals are so scheduled. Overtime work on certain floors, however, is not uncommon.

In 1979 Norwood was working for Dale in the Standard Oil Building on the night shift. On June 27, 1979, Dale posted a job vacancy announcement for a day shift washroom cleaning attendant position at the Standard Oil Building. The announcement stated that "[s]eniority shall be the governing factor in filling the vacancy provided the employee has the ability to be trained to perform this job." Dale's employees are represented by Local 25, Services Employees International Union, AFL–CIO. The phrasing of the day shift announcement was in accordance with Article XV, Section 3 of the Collective Bargaining Agreement in effect between the union and Dale. This section of the Agreement provided:

> When a vacancy occurs in any job covered by this Agreement, said job shall be posted for bidding in a conspicuous place and all employees may apply for the job. The posting shall contain a full description of the job duties, starting time and rate of pay. Seniority shall be the governing factor in filling the vacancy provided the employee has the ability to be trained to perform the job.

The written job description for the day shift position included the following duties:

a. Inspect floor
   (1) wipe up spills
   (2) pick up paper
b. Inspect hand towel dispenser
   (1) check contents of towel dispenser
   (2) refill if needed
   (3) press down on used towels in container
c. Inspect toilet tissue
   (1) check tissue in all stalls
   (2) obtain new rolls
   (3) remove empty core and replace with full roll
   (4) flush toilet when necessary
d. Inspect urinals and flush when necessary
e. Inspect sinks
   (1) wipe top of all sinks
   (2) wipe all faucets and handles
f. Inspect mirror and wipe where wet
g. Walk or ride down passenger elevator to next washroom
h. Adhere to schedule

The duties of the posted job were to be performed in the men's washrooms in the Standard Oil Building during the hours of 8:00 a.m. to 4:30 p.m. daily, Monday through Friday. These duties are the same or similar to the duties performed in the women's washrooms during the day shift. Eleven individuals applied for the day shift position. Of these eleven individuals, Norwood had the greatest seniority. Norwood was one of three women who applied for the job.

Dale complies with Standard Oil's unwritten policy with respect to the servicing of washrooms in the Standard Oil Building during the day shift. This policy, which was in effect in 1979, requires Dale to assign only male employees to service men's washrooms and to assign only female employees to service women's washrooms. Accordingly, Norwood was denied the transfer to the position announced in June, 1979. Instead of appointing Norwood to fill the position, Dale awarded the job to the most senior male applicant. Norwood, however, suffered no loss in wages by not being selected for the day shift position. Her rate of pay was the same on the night shift as it would have been on the day shift. She also chose not to bid for other day shift positions, such as utility worker, which had been posted by Dale beginning on July 2, 1979. Norwood is presently employed by Dale in the Stan-

dard Oil Building as a day shift relief elevator operator.

On or about July 14, 1979, John DeJonker ("DeJonker"), Norwood's supervisor, told Norwood that a male was selected for the men's washroom attendant position because Dale determined that a male was best suited for the particular job. Several days later, on July 19, 1979, R.F. Gandy, Superintendent of Building Maintenance for Standard Oil, wrote a letter to DeJonker which stated:

Regarding your recent query on staffing of the daytime—8:00 a.m. to 4:30 p.m.—monitoring paper supplies and necessary light housekeeping in the men's and ladies' washrooms throughout the Standard Oil Building, I must reaffirm with you our insistence on having male personnel service the men's rooms and female personnel servicing the women's rooms. We feel that this arrangement would best serve our needs without suffering any undue embarassing situations. It is not our intention to discriminate in employee selection but rather to have you assign personnel on a practical basis in this requirement.

Norwood filed a charge of sex discrimination against Dale with the Illinois Fair Employment Practices Commission ("FEPC") on July 25, 1979.[1] The FEPC cross-filed the charge with the federal Equal Employment Opportunities Commission. Norwood's charge, which was filed within 180 days of the alleged act of discrimination, claimed that Norwood had been discriminatorily denied a job by Dale as a washroom attendant on the day shift because of her sex.[2] On May 27, 1981, a Recommended Order and Decision was issued in which the Administrative Law Judge determined that the preponderance of the evidence sustained Norwood's charge. Plaintiff's Ex. B at 6. The recommended findings were reviewed by the Illi-

nois Human Rights Commission. In an Order and Decision dated December 17, 1981, the Commission reversed the Recommended Order and Decision and dismissed Norwood's charge. The Commission held, in pertinent part, that:

3. Respondent [Dale] discriminated against Complainant [Norwood] on the basis of her sex in violation of Section 3(a) of the Fair Employment Practices Act by refusing to transfer her to a position requiring light housekeeping duties in the men's washrooms located in the Standard Oil Building solely because of her sex.

4. Gender is a bona fide occupational qualification for the job vacancy in question in the washrooms located in the Standard Oil Building.

Order and Decision at 6.

Following the conclusion of the administrative proceedings before the Illinois Human Rights Commission, which took more than 180 days after the filing of Norwood's charge, Norwood was issued a "Notice of Right to Sue" by the Equal Employment Opportunity Commission. Norwood filed her complaint in federal court within 90 days of her receipt of this notice pursuant to the requirements of 42 U.S.C. § 2000e–5(f).

Norwood's one-count complaint alleges that the day shift cleaning assignment policy of Dale and a second-named defendant, Standard Oil Company of Indiana, Inc., discriminated against Norwood on the basis of her sex in violation of 42 U.S.C. § 2000e–2(a) and 29 C.F.R. § 1604.3. On November 18, 1982, Norwood filed an Amended Complaint. The sole purpose in filing an Amended Complaint was to correct the name of the second defendant by changing it from Standard Oil Company of Indiana, Inc., to Standard Oil Realty Corporation.

---

1. During the course of Norwood's proceedings before the FEPC, the FEPC was renamed the "Illinois Human Rights Commission."

2. Standard Oil was not named as a respondent in Norwood's FEPC charge. In an Order dated October 19, 1983 denying the motions for sum-

mary judgment of Dale and Standard Oil, however, this court ruled that Standard Oil is a proper defendant to this private action. Accordingly, Standard Oil did not raise this issue at trial.

None of the substantive allegations were changed.

## II. CONCLUSIONS OF LAW

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, provides in pertinent part:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, condition, or privileges of employment, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2(a)(1).

Under Title VII, however, it is not an unlawful employment practice to base hiring decisions on an applicant's gender if sex is a bona fide occupational qualification ("bfoq") for the position. The bfoq exception provides:

Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees ... where sex ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise....

42 U.S.C. § 2000e–2(e).

The bfoq exception in Title VII "was ... meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex." *Dothard v. Rawlinson,* 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977). *See also* 29 C.F.R. § 1604.2 (1983) ("[t]he [Equal Employment Opportunity] Commission believes that the bona fide occupational qualification exception as to sex should be interpreted narrowly...."). Nevertheless, the language of the bfoq exception is "compelling." *LeBeau v. Libbey-Owen-Ford Co.,* 727 F.2d 141, 148 (7th Cir.1984).

■ Dale and Standard Oil do not dispute that Norwood was denied the day shift washroom attendant position because of her sex. Instead, defendants argue that the policy of hiring only women to clean the women's washrooms and men to clean the men's washrooms is not unlawful because sex is a bfoq for the day shift washroom attendant positions. According to defendants, this policy is reasonably necessary to their normal business operations and protects the privacy interests of Standard Oil's tenants and guests.[3]

■ A defendant who asserts a bfoq defense bears the initial burden of proving that a factual basis exists for a sex-based hiring decision. When privacy considerations of clients or guests serve as a reason for hiring only members of one sex, however, the defendant must also prove that no reasonable alternatives exist to its gender-

**3.** In cases where a plaintiff alleges disparate treatment by an employer on the basis of sex, the plaintiff normally bears the initial burden at trial of establishing a *prima facie* case that sex discrimination has occurred. This burden may be satisfied by a showing that: (1) plaintiff belongs to a class of persons protected by Title VII; (2) plaintiff applied and was qualified for a job for which the employer was seeking applicants; (3) despite her qualifications he or she was rejected; and (4) after plaintiff's rejection the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See also Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

When an employer relies on a bfoq defense to justify what would otherwise be a violation of Title VII, however, the *prima facie* case analysis of the United States Supreme Court in *McDonnell Douglas Corp. v. Green, supra,* has been held to be inapplicable. *See, e.g., Harden v. Dayton Human Rehabilitation Center,* 520 F.Supp. 769 (S.D.Ohio 1981). In effect, an employer's claim of a bfoq for the position simultaneously admits gender-based discrimination and attempts to justify it. *EEOC v. Mercy Health Center,* 29 FEP Cases 159, 162 (W.D.Okla.1982). Thus, to require a plaintiff to establish a *prima facie* case of sex discrimination in the face of an assertion of a bfoq defense would be redundant. Rather than the initial burden falling on a plaintiff, then, the initial burden is placed on the defendant to prove that the otherwise unlawful policy or practice is reasonably necessary to the normal operation of the business.

1416

based hiring policy. *Fesel v. Masonic Home of Delaware, Inc.*, 447 F.Supp. 1346, 1351 (D.Del.1978), *aff'd*, 591 F.2d 1334 (3d Cir.1979). This additional burden is imposed on the defendant in order to ensure that no feasible reconciliation can be achieved between the general nondiscrimination principle of Title VII and the privacy rights of clients or guests. *Id.*

Because Dale and Standard Oil's bfoq defense arises in the context of privacy considerations of clients and guests, their burden at trial consisted of proving that a factual basis exists for the daytime washroom attendant policy and that no reasonable alternatives to the policy are available. The court finds that defendants have satisfied both elements of their burden of proof.

**A. *Factual Basis***

In certain situations the privacy rights of individuals justify sex-based hiring by an employer. The situations where privacy rights have been recognized as a bfoq involve those occupations which require an employee to work with or around individuals whose bodies are exposed in varying degrees. *See, e.g., Brooks v. ACF Industries, Inc.*, 537 F.Supp. 1122, 1132 (S.D.W. Va.1982) (staff nurse in health care facility's labor and delivery area); *Fesel v. Masonic Home of Delaware, Inc.*, 447 F.Supp. 1346, 1352–54 (D.Del.1978), *aff'd*, 591 F.2d 1334 (3d Cir.1979) (nursing assistants in home for the elderly); *Hodgson v. Robert Hall Clothes, Inc.*, 326 F.Supp. 1264, 1269 (D.Del.1971), *aff'd in relevant part*, 473 F.2d 589 (3d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 50, 38 L.Ed.2d 85 (1973) (salespersons in clothing store).

A defendant in privacy rights cases may satisfy its burden of proving a factual basis for a sex-based hiring policy by showing that the clients or guests of a particular business would not consent to service by a member of the opposite sex, and that the clients or guests would stop patronizing the business if members of the opposite sex were allowed to perform the service. *EEOC v. Mercy Health Center*, 29 FEP Cases 159 (W.D.Okla.1982); *Fesel v. Masonic Home of Delaware, Inc.*, 447 F.Supp. 1346 (D.Del.1978), *aff'd*, 591 F.2d 1334 (3d Cir.1979). In *Fesel*, for example, plaintiff, a male nursing student, applied for a position as a nurse's aide with defendant residential retirement home. The duties of the aide position included intimate personal care of both male and female guests and non-intimate care such as making beds, reading mail, and escorting patients on visits to doctors. In concluding that defendant had established a factual basis for its hiring policy, the *Fesel* court relied on the testimony of supervisors, physicians, guests of the home and expert witnesses. This testimony established that the female guests of the home would not tolerate care by male assistants and would leave the home if male assistants were hired.

Although Dale and Standard Oil's evidence at trial focused on the issue of the availability of reasonable alternatives, sufficient evidence was submitted by defendants to satisfy the requirement that a factual basis exists for the current sex-based policy. Edward Carmody, Vice President of Standard Oil Realty Corporation and Manager of Building Operations in the Standard Oil Building since 1973, testified that each day the Standard Oil Building contains seven to eight thousand regular employees and two to four thousand guests. According to Rita Novak, Dale's Day Supervisor in the Standard Oil Building, the washrooms in the building are being used approximately 90% of the time when she is in the washrooms during the day. Conversely, the washrooms are rarely used at night. Robert Woolf, Dale's Manager at the Standard Oil Building, also testified that the washrooms are in use approximately 80–90% of the daytime hours. One of the tenants in the Standard Oil Building, Donald Jones, testified that opposite sex servicing of the washrooms during the daytime would be an imposition and that he would object to the institution of an opposite sex policy. Dr. Laurie Larwood, Standard Oil's expert witness, informally questioned employees in the Standard Oil Building about opposite sex clean-

ing of washrooms. Based in part on these discussions, Dr. Larwood concluded that the current same sex policy imposes no stress on the users of the washrooms, whereas an opposite sex procedure would cause embarrassment and increased stress in both male and female washroom users (*e.g.*, men would not be able to urinate if a woman were present in the men's washroom). According to Dr. Larwood, the invasion of privacy that would be created by an opposite sex procedure would be extreme. Finally, Jean Mortimer, Leasing Coordinator in the Standard Oil Building, testified that opposite sex washroom servicing would have an effect on the prestige of the Standard Oil Building.

■ Dale and Standard Oil have established through the testimony of supervisors, tenants and expert witnesses that occupants of the Standard Oil Building would object to a member of the opposite sex entering their washrooms during the day to perform cleaning duties, and that if such a procedure were instituted the procedure would have a detrimental effect on the building. Unlike the defendant in *Fesel v. Masonic Home of Delaware, Inc., supra,* Dale and Standard Oil did not submit evidence that tenants would actually move out of the building if an opposite sex procedure were instituted. Despite this difference in the magnitude of evidence in the two cases, however, the court concludes that the intrusion on personal privacy which would occur if opposite sex attendants were allowed access into the washrooms while in use is sufficiently substantial so as to constitute a factual basis for defendants sex-based policy. Moreover, the court finds that a factual basis for the same sex policy existed in 1979 when Norwood applied for the day shift cleaning attendant position in the men's washroom.

### B. *Reasonable Alternatives*

Norwood did not dispute at trial that the privacy rights of the users of the washrooms in the Standard Oil Building would be violated if the washroom of one sex were entered into by a member of the opposite sex while the washroom was in use. Instead, the principal issue at trial was whether any reasonable alternative was available which would allow opposite sex cleaning of the washrooms while still honoring the privacy rights of Standard Oil's tenants and guests.

At the time that Norwood applied for the day shift men's washroom attendant position, Standard Oil considered and eventually rejected four alternatives to its daytime policy of allowing only female attendants to service women's washrooms and male attendants to service men's washrooms:

1. Day servicing can be eliminated;

2. Opposite sex servicing can be allowed while the washrooms are in use;

3. Opposite sex servicing can be allowed with the washrooms being closed while servicing is being performed;

4. Opposite sex servicing can be allowed with the attendant being instructed to leave the washroom if someone wishes to use it while servicing is being performed.

Standard Oil's Post Trial Brief at 2.

The argument at trial focused on the reasonableness of the third and fourth alternatives. Dale and Standard Oil presented testimony to establish that neither of the two alternatives was acceptable because each would cause unreasonable interference with the normal operation of their businesses. The defendants identified six specific problems which would arise in varying degrees under either alternative: (1) privacy rights of tenants and guests would be compromised; (2) productive work time of employees would be lost; (3) costs for janitorial service would increase; (4) security problems in the Standard Oil Building would increase; (5) desirability of the Standard Oil Building as rental property would decrease; and (6) efficiency of Dale's daytime washroom cleaning procedure would decrease.

### 1. Closing of Washrooms While Servicing Performed

One of the procedures suggested as an alternative to Dale and Standard Oil's daytime washroom attendant policy would involve closing the washrooms in the Standard Oil Building one floor at a time in order to allow opposite sex cleaning of the washrooms. Each washroom on a floor would be closed in accordance with a pre-planned, posted schedule. Although this procedure would allow opposite sex servicing of the washrooms, significant problems would arise from instituting the procedure. These problems render the procedure an unreasonable alternative to the defendants' current same sex policy.

The interior design of the Standard Oil Building raises several unique problems which must be considered when analyzing the feasibility of this proposed alternative. The building contains only one washroom for each sex per floor. On some floors the washrooms are located in restricted areas not accessible to the public or other tenants. On most floors the washrooms are locked and only the tenants on the particular floor have keys to the washrooms on that floor. Moreover, the elevator system in the Standard Oil Building renders between floor travel difficult in some areas because the elevators only service designated ranges of floors. Users of washrooms on a floor which was the "boundary" between two ranges would thus have to transfer to a different elevator bank in order to reach another floor's washroom. Even tenants located in the middle of a range of floors may have to transfer elevators to reach a washroom on another floor if the floors above and below contain washrooms in restricted areas.[4] Thus, during the cleaning period tenants would be forced to conduct an inconvenient, time consuming and sometimes difficult search for a washroom when the need to use a washroom may be acute.

More fundamental problems exist with the scheduled closure alternative. In particular, additional costs would be incurred by Standard Oil if this alternative were instituted.[5] The time spent by Dale employees on each floor of the Standard Oil Building is tightly scheduled and does not allow for delays. Three to four minutes are allotted per washroom for the daytime cleaning procedure. If the Dale employees are delayed at any point in the day, it is not possible to complete the cleaning of the remaining washrooms within the allotted time.

Under the scheduled closure alternative, the amount of time spent by Dale employees on each floor would inevitably increase due to the need to wait until all individuals in an opposite sex washroom exited before the cleaning procedure could begin. These delays would render it impossible for Dale's current staff of four employees to complete the twice daily cleaning program in a normal working day. As a result, Dale would have to hire additional employees to compensate for the presence of unproductive waiting time in the day shift schedule.

The testimony presented at trial as to the number of additional employees that would be required and the concomitant amount of additional cost to Standard Oil was conflicting. All of the witnesses (even Norwood's expert witness), agreed, however, that at a minimum, one or two additional employees would have to be hired at a cost of $21,000 to $23,000 per employee or a total additional annual cost of between $50,000 and $60,000. Estimates by defendants' witnesses ranged as high as six additional employees at a cost of $164,000 per year.

---

**4.** Standard Oil uses the 61st floor of the Standard Oil Building as an illustration of the elevator-restricted area problem. According to Standard Oil, tenants or guests on the 61st floor would have to go up a minimum of four floors or down a minimum of six floors to gain entry to a washroom when servicing is being performed because access to the washrooms on floors 56 to 60 and 62 to 64 is restricted. Standard Oil's Post Trial Brief at 5.

**5.** Any costs incurred by Dale in the janitorial procedures performed in the Standard Oil Building are passed along to Standard Oil as the contractor of Dale's services.

Additional costs would also be incurred through the need to change the lock and key system on all washroom doors so that tenants from a floor whose washroom was being serviced could use a washroom on a different floor. No estimates were provided at trial as to the amount of money involved in this procedure.

Less tangible problems arising from a scheduled closure system were identified at trial. First, Standard Oil's expert witness, Dr. Laurie Larwood, established through her testimony that interruption of washroom service would cause significant stress among the Standard Oil Building's tenants and visitors in that the washrooms' closure would hinder and delay their ability to perform bodily functions. Second, visitors to the building would not know of the daytime cleaning schedule and may be foreclosed from using a washroom in the building if the most readily available washroom is closed for servicing. Third, security problems in the building would increase due to a greater traffic flow between floors from those persons searching for an open washroom. Greater security problems would also occur because persons would have keys to floors and washrooms on floors other than their own. Fourth, employers would have a more difficult time supervising their employees because of the need to travel to other floors at certain times of the day. The productivity of employees, on the other hand, would decrease as a result of work time lost in searching for an available washroom. The combined effect of these problems would be to decrease the desirability of the Standard Oil Building as rental property. The tenant's rental agreements contemplate open and easy access to washrooms on their floors at all times.

Finally, certain problems result from a scheduled washroom closure system over and above those previously discussed. Some tenants will insist in emergency situations on using a particular washroom whether or not cleaning is being done or is scheduled to begin. Even in non-urgent situations, some tenants and visitors would refuse to adhere to the washroom cleaning schedule, which could lead to belligerent confrontations between the tenant or visitor and the Dale employee attempting to clean the washroom. These confrontations would further disrupt Dale's washroom servicing procedure. Robert Woolf, Dale's Manager at the Standard Oil Building, testified that he had attempted to work under a scheduled closure system in a building similar to that of the Standard Oil Building. Washroom users in the similar building did not obey posted signs that cleaning was in progress. According to Woolf, verbal requests to allow the attendant to complete his tasks were ignored.

The court finds that the scheduled closure of washrooms in the Standard Oil Building is an unreasonable alternative to defendants' same sex policy. The scheduled closure procedure would unreasonably infringe on the privacy rights of tenants and guests, disrupt the business operations of Dale and Standard Oil, and impose substantial additional costs on Standard Oil for janitorial services. In the context of sex-based hiring policies prompted by privacy considerations, Title VII does not require defendants to undertake the degree of fundamental restructuring which would be needed if this opposite sex washroom attendant alternative were adopted.

Norwood's arguments in support of the scheduled closure alternative's reasonableness are unavailing. According to Norwood defendants' belief that tenants' privacy rights would be violated if day shift employees were allowed to clean opposite sex washrooms is in glaring contrast to defendants' night shift cleaning policy. The hiring of employees on the night shift is not sex-based; employees may enter opposite sex washrooms at night when the washrooms are not in use in order to perform heavy cleaning tasks. But as defendants point out, there are only 80 individuals regularly in the building at night compared to up to 12,000 during the day. Most of the building's employees leave by 6:00 p.m. Consequently, the possibility of the washrooms being used after 6:00 p.m. when night shift cleaning is ready to begin is greatly reduced. Moreover, scheduling of

the Dale night shift employees is different and more flexible than that on the day shift. These differences in the two shifts render it inappropriate to use the night shift as an example of how the day shift could be modified to accommodate opposite sex cleaning.

Defendants' insistence that the same sex policy is the only reasonable daytime cleaning method is also suspect, Norwood claims, because opposite sex cleaning is allowed during the daytime at other buildings serviced by Dale. One such building is the Amoco Research Facility located in Naperville, Illinois. Again, however, Norwood's comparison is not appropriate. The unique features of the Standard Oil Building, such as the number of washrooms per floor, washroom location on the floor, the elevator system, the security system, the standard of cleanliness, and the rental nature of the building distinguish the Standard Oil Building from most others. The bfoq defense propounded by defendants must be viewed in the particular circumstances in which it is invoked. Only buildings with characteristics similar to the Standard Oil Building may serve as a basis of comparison. The Amoco Research Facility does not appear to be one of them. Other buildings identified by Norwood at trial as allowing daytime opposite sex washroom cleaning were not sufficiently described so as to enable the court to determine whether they would serve as appropriate comparisons.

Defendants estimated at trial that a person's average washroom use time is 5 to 20 minutes, and that the amount of time required to clean a washroom under the scheduled closure alternative was 8 to 20 minutes due to delays caused by an inability to enter opposite sex washrooms while in use. Norwood argues that these estimates are too high. Norwood estimates that a person completes a washroom visit within 3 minutes. Moreover, Norwood proposes that if a female washroom attendant were not able to enter the men's washroom because it was in use, the attendant could obtain supplies from the men's washroom, clean the women's washroom, and go back to clean the men's washroom which would have emptied in the meantime. No intrusion on the users of the men's washroom would occur when obtaining supplies, according to Norwood, because the supplies are kept just inside the entrance to the men's washroom in an area not visible from the area containing the urinals, sinks and commodes.

The court finds that Norwood's proposals contain several flaws. First, washroom visits are likely to last greater than 3 minutes. Due to the facilities in the women's washrooms, for example, the washrooms are often used for reading, relaxing, changing clothes and social gathering. Second, if a female washroom attendant were unable to clean the men's washroom because it is in use, it is likely still to be in use when she returns from cleaning the women's washroom because of the heavy daytime use of the washrooms in the Standard Oil Building. The attendant would then be forced to wait until the opposite sex washroom emptied before commencing cleaning. Finally, there are no other "outside washroom" tasks that can be assigned to the day shift washroom attendants under the present system. The attendants are hired specifically to clean the washrooms twice each day and other members of the maintenance staff are responsible for any duties outside the washrooms. The court will not require Dale and Standard Oil to modify these other maintenance positions solely to give washroom attendants more work to do.

Norwood raises four principal arguments concerning defendants' bfoq defense. Under the first argument, Norwood claims that the bfoq defense should fail because it is not recognized as a valid defense based on the Equal Employment Opportunity Commission Guidelines. The pertinent EEOC Guidelines provide:

1604.2 Sex as a bona fide occupational qualification.

(1) The commission will find that the following situations do not warrant the ap-

plication of the bona fide occupational qualification exception:

\* \* \* \* \* \*

(iii) The refusal to hire an individual because of the preference of coworkers, the employer, clients or customers except as covered specifically in paragraph (a)(2) of this section.

(2) Where it is necessary for the purpose of authenticity or genuineness, the commission will consider sex to be a bona fide occupational qualification, e.g. an actor or actress.

29 C.F.R. § 1604.2(a) (1983).[6]

More is involved with defendant's daytime policy, however, than a mere preference by customers for one method of operation over another. The policy at issue in the instant case involves a recognition of a fundamental concern over the exposure of one's body in the presence of a member of the opposite sex. *See, e.g., Brooks v. ACF Industries, Inc.,* 537 F.Supp. 1122, 1132 (S.D.Va.1982) (while using a washroom, a person has legitimate privacy rights that would otherwise be violated by the entry into the washroom by an opposite sex cleaning attendant); *Fesel v. Masonic Home of Delaware, Inc., supra* at 1352, (case is not one governed by the regulatory provision concerning customer preference because personal privacy interests are implicated in case which are protected by law and which have to be recognized by an employer in running its business). Moreover, as Standard Oil points out, Standard Oil's "customers" are not expressing a preference for a particular sex to clean washrooms, they are expressing a preference for easy access to a washroom and for the honoring of basis privacy concerns. Standard Oil Post Trial Brief at 6.

Second, Norwood argues that the only relevant issue is whether the male sex is a

bfoq for the daytime washroom attendant position, not whether the female sex is a bfoq for a women's washroom attendant position. But this court cannot so narrowly focus the consideration of defendants' day shift policy. The court cannot rule that sex is a bfoq for the men's washroom attendant position without also ruling that sex is a bfoq for the women's washroom position. To do otherwise would create a disparate impact where there currently is none. The day shift policy now treats men exactly the same as women: neither are allowed to clean the other sex's washroom. Thus, the court will consider the evidence submitted as to the effect on women of a male cleaning attendant entering their washroom, as well as the effect on men of a woman attendant entering the men's washroom.

Norwood's third principal argument is that in assessing defendants' bfoq defense the court must consider Norwood's actual ability to perform the work pursuant to *In re Consolidated Pretrial Proceedings,* 582 F.2d 1142 (7th Cir.1978) and *Rosenfeld v. Southern Pacific Co.,* 444 F.2d 1219 (9th Cir.1971). These cases mandate that "sexual characteristics, rather than characteristics that might, to one degree or another, correlate with a particular sex, must be the basis for the application of the BFOQ exception." 582 F.2d at 1146; 444 F.2d at 1225. The approach required by *Pretrial Proceedings* and *Rosenfeld,* however, applies only to those cases in which a bfoq defense is asserted by an employer who believes that one sex does not possess the physical capacity to perform the responsibilities connected with a job. *See, e.g., Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Diaz v. Pan American World Airways,* 442 F.2d 385 (5th Cir.), *cert. denied,* 404 U.S. 950, 92

---

**6.** *Cf.* Illinois Fair Employment Practice's Commission's Guidelines. These guidelines were in effect at the time Norwood was denied the day shift men's washroom attendant position. The pertinent section of the guidelines provides:

(B) The Commission views the following as instances in which a bona fide occupational qualification may be established:

\* \* \* \* \* \*

(2) where the community standards not otherwise inconsistent with the Act demand that a person of a particular sex be selected, e.g., a male to be a men's washroom attendant.... Illinois Fair Employment Practices Commission Guidelines 2.2(B).

S.Ct. 275, 30 L.Ed.2d 267 (1971). In contrast, the consideration of a person's actual ability to perform a job does not apply when the bfoq defense is asserted in the context of an employer's refusal to hire members of the opposite sex due to the employer's perception of the privacy interests of its tenants and guests.

Despite the amount of time that Norwood devotes to a discussion of *Pretrial Proceedings* and *Rosenfeld*, she seems to recognize that these cases and the analytical approach they propound are inapposite when a bfoq defense is based on privacy considerations. Instead, Norwood argues that because defendants have "admitted" that job responsibilities may be assigned in such a manner that tenants' privacy rights will not be violated, they must discharge the *Rosenfeld* burden of showing that Norwood herself is incapable of performing the job. Moreover, Norwood claims that defendants' real objection to opposite sex cleaning is not the infringement of privacy rights but the increased costs that would be incurred by such a system. The court does not agree that defendants have conceded or waived their argument that privacy rights will be infringed under an opposite sex system. As the evidence at trial demonstrated, privacy would be invaded to a degree under *any* opposite sex system. Even the least intrusive alternative, the scheduled closing of the washrooms each day, would still cause stress to tenants and guests when an attendant knocked on the opposite sex's washroom's door to determine if the washroom were in use. A person using the washroom at the time would not know if the attendant would, nevertheless, enter the washroom, not realizing the washroom was still in use. Moreover, the knock may not be heard due to distance from the door or the noise caused by running water.

Finally, Norwood argues that the expense of eliminating a discriminatory policy cannot justify its continuation. Norwood cites *Bush v. Lone Star Steel Co.*, 373 F.Supp. 526, 533 (E.D.Tex.1974) in support of this proposition. But cost is not the only consideration of defendants in the instant case. From the beginning, defendants were concerned with the impact an opposite sex system would have on the privacy considerations of tenants and guests. *See* Letter of July 19, 1979 from R.F. Gandy to John DeJonker, *supra* ("We feel this [same sex] arrangement would best serve our needs without suffering any undue embarrassing situations.") This implicit concern over fundamental privacy rights did not waiver at trial, nor was it superseded by purely financial motivations. The court recognizes, however, that cost was one of the factors in defendants' decision to reject all of the opposite sex alternatives. Similarly, cost has been a factor, but not the only factor, in this court's finding that it would be unreasonable to require defendants to change the daytime cleaning attendant policy into one which would allow the cleaning of washrooms by members of the opposite sex. *Accord, Fesel v. Masonic Home of Delaware, Inc., supra* (defendant under no duty to hire additional staff in order to accommodate job aspirant whose employment would conflict with customer privacy rights). In essence, cost has added to, but does not prompt, the finding of the unreasonableness of the opposite sex system in the Standard Oil Building. The fundamental nature of the privacy rights involved, in conjunction with the substantial costs of instituting an opposite sex system distinguish this case from *Bush v. Lone Star Steel Co., supra,* and the other cases cited by Norwood in support of her cost argument.

For the foregoing reasons, the court finds that the scheduled closure system is an unreasonable alternative to defendants' same sex washroom attendant policy.

### 2. Attendant Leaves When Individual Wants to Use Washroom

The second procedure suggested as an alternative to Dale and Standard Oil's same sex washroom attendant policy would allow the washrooms on each floor to remain open at all times throughout the day but would require the attendant to leave the opposite sex washroom during the cleaning

process whenever a person wishes to use the washroom. While tenants would not have to search for washrooms on other floors under the second alternative, tenants would be faced with a greater probability of embarrassing or stressful confrontations with cleaning attendants of the opposite sex in their washroom.

Another problem with this alternative is the disruption which would be caused in Dale's daytime cleaning schedule. The attendant would have to leave the opposite sex washroom every time someone wished to use it and would have to wait until the washroom was empty before beginning or continuing the cleaning procedure. In view of the heavy use of the washrooms in the Standard Oil Building, the number of times the attendant would be asked to leave would be significant. As a result, the time spent by an attendant on each floor would increase considerably. The delay would render it impossible for the attendant to complete the cleaning of all assigned floors, and additional staff would have to be hired due to the decrease in the number of floors that could reasonably be managed by an employee on a single day. The increase in cost that would be incurred by Standard Oil from these additional employees would likely be higher than that incurred under the first alternative because of the greater number of delays in cleaning. Accordingly, the court also finds this alternative to be unreasonable.

### III. CONCLUSION

Plaintiff Vera Norwood's discrimination claim against defendants Dale and Standard Oil serves as an example of the point at which a line must be drawn between employment positions open equally to both sexes and positions open only to members of one sex. Fortunately, the vast majority of employment positions fall on the side of the line where employers cannot discriminate on the basis of sex. For those positions in which a customer's fundamental privacy rights are implicated, however, courts have been reluctant to carry Title VII so far as to require those rights to be infringed for the sake of equality. The position in the instant case is one in which fundamental rights are involved. Time spent by an individual in a washroom is personal and private. The court will not require defendants to institute an alternative which would allow opposite sex cleaning but which would also infringe on privacy rights and unreasonably disrupt the normal operation of defendants' businesses. The current policy of Dale and Standard Oil applies equally to both sexes and is not, as Norwood claims, a manifestation of "romantic paternalism." Instead, the policy reasonably accommodates the privacy rights of Standard Oil's tenants and guests and the unique features and requirements of the Standard Oil Building.

Accordingly, the court finds that sex is a bona fide occupational qualification reasonably necessary to the normal operation of Dale and Standard Oil's businesses. Judgment is hereby entered in favor of defendants. Defendant Standard Oil's request for an award of its costs reasonably incurred in this matter is denied.