LOCAL 567 AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICI-PAL EMPLOYEES, AFL–CIO, Lisa Schwerin, Janet Hublet, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

MICHIGAN COUNCIL 25, AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL–CIO, and its affiliated member Locals 49, 129, 652, 658, 831, 960, 1105, 1120, 1138, 1345, 1356, 1836, 1837, 2008, 2449, 2619, 2945, and 3035; Gloria Gross and Susan Fergus-Lober, on behalf of themselves and all others similarly situated, Plaintiffs-Intervenors,

v.

STATE OF MICHIGAN and its principal departments and agencies, its Director of the Department of Mental Health, Director of the Oakdale Regional Center for Developmental Disabilities, the State Personnel Director, and Michigan Department of Mental Health, and its principal institutions, Michigan Civil Service Commission, Michigan Department of Civil Service, and Michigan Office of the State Employer, Defendants.

No. 82–40178.

United States District Court, E.D. Michigan, S.D.—Flint.

Feb. 27, 1986.

Lowell M. Seyburn, Kalamazoo, Mich., S. Olof Karlstrom, Brian M. Barkey, Flint,

Mich., David J. Houston, Southfield, Mich., for plaintiffs.

Craig Atchinson, George L. McCargar, Asst. Attys. Gen., Lansing, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

On November 21, 1985, the parties in the above-captioned matter were ordered to submit briefs "on the issue of whether privacy interest of mental health patients was sufficient to classify or employ people on the basis of sex and whether the resolution of this issue is sufficient to decide liability in the instant case." This case arises out of the layoffs, transfers, and recalls of female workers for the State of Michigan's mental health care institutions. Plaintiffs claim that defendants laid off and recalled female employees differently from male workers with the same job. Defendants argue that the selective certification is based on a bona fide occupational qualification (BFOQ) which is necessary to protect the privacy rights of mental health patients and that there were no reasonable alternatives to this system.

In August, 1975, Chapter 7 of the Michigan Mental Health Code took effect which included provisions for the protection for patients' rights. In April, 1976, the Attorney General issued an opinion that a BFOQ on the basis of sex could exist if necessary to protect the rights of residents of mental health facilities. The Director of the Michigan Department of Mental Health then sent a memorandum to all facility directors indicating that selective certification based on sex was allowed in certain situations. In December, 1976, the Personnel Director of that department gave additional guidelines as to how the institutions could certi-

fy by sex, and as a result, many institutions began selective certification with the assistance of the Department of Civil Service.[1]

In 1980, severe budget cuts resulted in reductions in staff and in order to maintain the number of males to provide same-sex care, females with more seniority were laid off while male attendants with less seniority were retained. Defendants agree that only females were laid off out of line because of their greater numbers. Plaintiffs contend that at several institutions which closed, (Hillcrest and Plymouth) female employees were denied the opportunity to transfer to other institutions, (i.e., Northville) because of the selective certification system which had not been asserted prior to this time and is not presently asserted.

## BFOQ DEFENSE

For purposes of this opinion, it is assumed that plaintiffs have satisfied their prima facie case so that the burden shifts to defendants to articulate a legitimate, non-discriminatory reason for the selective certification system. Section 703(e) of Title VII, 42 U.S.C. § 2000e–2(e) provides:

Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ ... on the basis of ... sex ... in those certain instances where ... sex ... is a bona fide occupational qualification *reasonably necessary* to the *normal operation* of that particular business or enterprise ...

(emphasis added.)[2]

In addition to this exception, the Equal Employment Opportunity Commission has issued guidelines stating that BFOQs should be interpreted narrowly, that individuals be hired on the basis of individual capacities rather than on stereotyped char-

---

**1.** Plaintiffs contend that in May, 1980, the Oakdale Center took the position that only male RCAs could care for male residents and only female RCAs could care for female residents, but that did not count for children under the age of puberty or who were receiving care. This approach has apparently been dropped in virtually all institutions and only Oakdale continued with some sex care certification.

**2.** The Michigan Elliott-Larsen Civil Rights Act, § 208 M.C.L.A. § 37.2208 is essentially the same.

acterizations of the sexes and that BFOQs should not be established on the basis of customer preference. 29 C.F.R. § 1604.2. Here, defendants contend that they are under an obligation to protect the privacy rights of mentally ill patients and developmentally disabled residents.

 In *Dothard v. Rowlinsin,* 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786, 800 (1977), the United States Supreme Court stated that "the BFOQ exception was ... meant to be an *extremely narrow* exception to the general prohibition of discrimination on the basis of sex." (emphasis added) Because it is a narrow exception, the burden on defendants to establish the facts within the exception is very heavy, *Weeks v. Southern Bell T & T Co.,* 408 F.2d 228 (5th Cir.1969); *Griffen v. Michigan Dept. of Corrections,* 30 FED 638 (E.D.Mich.1982). This burden requires that defendants show there is a factual basis for defendants' conclusion that the essence of their business operation would be undermined by failing to hire members of one sex exclusively. *Diaz v. Pan American Airways,* 442 F.2d 385 (5th Cir.) *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971); *Weeks, supra.* Next, defendants must prove that they have a "basis in fact" for believing that no members of one sex could perform the job. *Dothard, supra,* 433 U.S. at 335, 97 S.Ct. at 2730. Finally, there is substantial authority for the proposition that defendants must show that some less restrictive alternative is not available in order to avoid the classification. *Griffen, supra; See also Harless v. Duck,* 619 F.2d 611 (6th Cir. 1980). Assertions of sex-based employee classification cannot be made on the basis of stereotypes or customer preferences. *Diaz, supra; Weeks, supra.*

 The issue in this case is whether personal privacy rights of residents and patients in state mental health facilities can provide the basis for a BFOQ. Defendants contend that personal privacy rights of these residents are guaranteed by the United States Constitution and laws of Michigan. Defendants go on to cite cases in which the privacy interests of elderly nursing home residents, pregnant women, juveniles and male workers create a necessity sufficient to justify as a BFOQ.

Although there is nothing on point, it is clear that in certain situations privacy rights of individuals will justify sex-based classifications. These cases seem to involve occupations in which an employee must work with or around individuals whose bodies are exposed in varying degrees. In these cases the courts have noted the fundamental privacy rights of patients and customers. Moreover, they have recognized that when privacy rights are asserted, defendants, in claiming a BFOQ, bear an added burden of proving that no reasonable alternatives exist to its gender based classifications.

> This additional burden is imposed ... in order to ensure that no possible reconciliation can be achieved between the ... principles of Title VII and the privacy rights of clients or guests.

*Fesel v. Masonic Home,* 447 F.Supp. 1346, 1351 (D.Del.1978), *aff'd* 591 F.2d 1334 (3d Cir.1979). *See also Norwood v. Dale Maintenance System, Inc.,* 590 F.Supp. 1410 (N.D.Ill.1984).

In *Backus v. Baptist Medical Center,* 510 F.Supp. 1191 (E.D.Ark.1981), a male nurse brought suit against the defendant hospital contending that the hospital's refusal to transfer him to the labor and delivery section of the OB–GYN department was unlawful discrimination. Defendant relied on the privacy rights of its patients in asserting a BFOQ. The testimony reflected that "[a]n obstetrical patient constantly has her genitalia exposed [and that] there [were] few duties which a registered nurse [could] do in relation to an obstetrical patient which [were] not sensitive or intimate." The Court held that if a male nurse performed these duties, the patients' constitutional right to privacy would be violated.

As to whether the Hospital could assert a patient's privacy rights, the court noted not only the potential customer loss and higher administrative costs resulting in ec-

onomic injury to the defendant, but also that the "patients' rights have become intertwined with the rights of the [defendant] due to the professional relationship ..." *Id.* at 1193 (*citing Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972)). The court found that defendant had satisfied its burden noting that defendant had furnished sufficient evidence to create a factual basis for believing that a male nurse would be objectionable to patients and that patients' objections could not be scheduled around.[3]

Other cases follow essentially the same pattern. In *Fesel v. Masonic Home of Delaware*, 447 F.Supp. 1346 (D.C.Del.1978), a nursing home refused to hire plaintiff, a male nurse, because female patients objected to being cared for by a man. Because personal privacy rights were implicated, the court held that patients' desires could justify defendant's practice if it could show that it was not possible to schedule matters so it could both hire plaintiff and ensure patients' privacy. As in *Backus*, the court in *Fesel* did an extensive review of the defendant's factual basis for believing that hiring male nurses would directly undermine the essence of the employer's business.[4]

The Court agrees with the defendants that the reasoning in *Backus* and *Fesel* applies here. The privacy rights of mental health patients or residents in mental health facilities can justify a BFOQ to provide for same-sex personal hygiene care. As the court in *York v. Story*, 324 F.2d 450 (9th Cir.1963), *cert. denied*, 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964) stated:

> We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.

It is obvious that the law recognizes the privacy rights of these patients or residents and that the defendants had the right to protect these rights, possibly even more so in the case of mental health patients who are far more reliant on the protection of the defendants than patients in hospitals. Moreover, failure to recognize their privacy rights is contrary to the concept of normalization which recognizes that mentally handicapped persons have a right to lives as close as possible to that which is typical for the general population.[5]

Although plaintiffs do recognize constitutional and non-constitutional rights to privacy, they do not recognize that the gender of the intruder is of any significance. "The violation of the right of privacy would be just as pronounced were the right defined in a constitutional sense or in the traditional tort sense, without regard to the sex of the transgressor." Not only is this an unrealistic view of human mores in this country, but it is contrary to the law.[6] Obviously most people would find it a greater intrusion of their dignity and privacy to have their naked bodies viewed (or any number of personal services per-

---

**3.** See also *EEOC v. Mercy Health Center*, 29 FEP 159, 162 (W.D.Okla.1982) ("expectant mother has a greater right to a preference than the typical business customer or client since '[h]er personal privacy interests are implicated which are protected by law and which have to be recognized by the employer in running its business' ").

**4.** *See also Norwood, supra* (violation of personal privacy rights paramount in holding that sex was a BFOQ for daytime washroom cleaners); *Brooks v. ACF Indus., Inc.*, 537 F.Supp. 1122 (S.D.W.Va.1982) (sex was a BFOQ to being a janitor because janitors required to work in bathhouses).

**5.** Chapter 7 of the Mental Health Code, 1974 P.A. 258, § 702, M.C.L.A. § 330.1702 recognizes that the rights of recipients of mental health care are not diminished by reason of their residing in a state institution.

**6.** *See Fesel, supra* and *Backus, supra. See also Lewis v. Dayton-Hudson Corp.*, 128 Mich.App. 165, 339 N.W.2d 857 (1983) ("modicum of privacy" in defendant's fitting room afforded to customers does not include freedom from overhead observation by a store security guard who is of the *same sex* as the customers).

formed) by a member of the opposite sex.[7] Although there will be a certain relinquishment of privacy by necessity when anyone is admitted to a hospital or mental health facility, this is not to say that a patient has forfeited all rights to privacy. To accept plaintiffs' argument would maximize any existing invasions.

> It would be a strange doctrine ... that would decree that the sanctity of the right of privacy in the performance of excretory functions, fully respected in a public restroom, is forfeited by the fact of falling ill and becoming hospitalized. It is no answer to say that the necessity for prudery to give way to medical necessity has always been recognized ... so far as doctors themselves are concerned ...
>
> It is necessary ... to stress that the purpose of the sex provisions of [Title VII] is to eliminate sex discrimination in employment, not to make over the accepted mores and personal sensitivities of the American people ...

A. Larson, *Employment Discrimination —Sex.* § 14.30, 4–8 (3d ed. 1980).

Plaintiffs also cite several cases involving the privacy rights of prisoners apparently for the proposition that the gender of the perpetrator is of no significance. *See. e.g., Griffen v. Dept. of Corrections,* 30 FEP 639 (E.D.Mich.1982). Not only is it true that prisoners have relinquished much of their privacy rights (*Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)), unlike mental health patients, but it is clear that in almost every case with the exception of *Griffen,* the courts recognized the prisoners' limited privacy rights. Generally, the outcome of these cases have been influenced by such factors as the extent of the privacy invasion and methods of reducing the invasion. *See Larson, supra* at § 14.30, 4–9 to 4–11.

 Therefore, for the above-mentioned reasons, it is clear that the privacy rights of mental health patients can justify such a BFOQ. However, there still remains the issue of whether the facts of this case support the BFOQ. Defendants have the burden of showing that the essence of their operation would be undermined by failing to have these sex-based classifications and they must present a factual basis for this belief. Next, they must show that no reasonable alternatives exist to these sex-based classifications. Thus, the second issue which the Court ordered addressed need not be dealt with because it remains to be seen whether the BFOQ applies in this case.

IT IS SO ORDERED.

---

7. While I dare say this statement is accurate, it by no means expresses the view that that is the natural order of things. It is in fact a cultural thing. But there is no reason why cultural attitudes cannot be protected. As a matter of fact, since the essence of the matter here under consideration is personal privacy, there are no imperatives, no "shoulds" or "shouldn'ts." That is the essence of privacy, that there is no norm. It is private.