### Ralph P. OLSEN, Plaintiff,

v.

### MARRIOTT INTERNATIONAL, INC., a Delaware corporation, d/b/a/ Marriott's Camelback Inn, Defendant.

### No. CIV97–1506PHX–ROS.

United States District Court,
D. Arizona.

Nov. 22, 1999.

---

**1056**

Francis G Fanning, Tempe, AZ, for Ralph P Olsen.

Leigh Eric Dowell, Bryan Cave LLP, Phoenix, AZ, for Marriott International, Inc.

## ORDER

SILVER, District Judge.

In 1993, Ralph Olsen applied for a position as a massage therapist with the Spa at Marriott's Camelback Inn. The Marriott refused to consider Mr. Olsen for the position because he is male. Mr. Olsen filed this action alleging that the Marriott's failure to hire him constitutes overt sex discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.* The Marriott's defense is based on the argument that being female is a bona fide occupational qualification for the percentage of massage therapists necessary to satisfy customer requests for female therapists. The parties have filed cross-motions for summary judgment and other related motions.

## PRELIMINARY EVIDENTIARY AND PROCEDURAL ISSUES

### I. Motions to Strike

#### A. Report of the Marriott's Expert Witness Dr. Muriel McClellan

██ Olsen has filed a Motion to Strike the report of the Marriott's expert witness, Dr. Muriel McClellan. As Plaintiff indicates, pursuant to Federal Rule of Evidence 702, the Court is obliged to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 2799, 125 L.Ed.2d 469 (1993). This "gatekeeping" requirements applies to all expert testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1174–75, 143 L.Ed.2d 238 (1999). The Marriott argues that Dr. McClellan's opinions are reliable "because they are drawn from her professional education and experience as a practicing psychologist and mental health educator." The Court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 1176.

In opining that massage clients should be allowed to choose the gender of their massage therapist, Dr. McClellan relies on her knowledge of gender roles and the effects of sexual abuse. A portion of her opinion contains general information about these topics, information such as typical characteristics of sexual abuse survivors and the impact of events that trigger memories of abuse. The supplemental expert report submitted by the Marriott indicates that Dr. McClellan has taught about gender and sexual abuse issues during a career of over thirty years as an educator in the mental health field at places including Arizona State University. In her role as an educator, she also has developed curricula addressing gender and sexual abuse issues at the Union Institute in Ohio and the Institute for Creative Change in Phoenix. In addition, she has offered numerous continuing education workshops on sexual abuse and gender issues. Dr. McClellan also has gained experience in addressing sexual abuse and gender issues in her private practice during the past twenty years. Given her knowledge and experience, the Court concludes that Dr. McClellan is qualified to provide expert testimony regarding the issues of sexual abuse and gender, and the general information she provides on these topics is reliable.

■ The Marriott has not established the reliability of other portions of Dr. McClellan's expert report, including the studies she cites. In her report, Dr. McClellan states:

Finkelhor, a leader in the sexual abuse field, has compared studies on sexual abuse. He found the range of women who have been abused to be anywhere from 7% to 36% and 3% to 29% for men.

(McClellan Report at 3, Def.'s Exh. 5). McClellan does not provide a full citation to Finkelhor's report or the studies he compares, nor does the Marriott offer any evidence that the studies are reliable based on either the factors set forth in *Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–97, or any other factors.[1] Her citation to Candice Pert's "landmark work" at Georgetown Medical Center regarding kinesthetic memories suffers from the same deficits—incomplete citation and no evidence regarding reliability.

■ The Marriott also has not established the reliability of Dr. McClellan's opinion about the impact of either gender or sexual abuse on the massage experience. The Marriott has offered no evidence indicating that McClellan has studied, taught, conducted research, or written about the subject of psychological effects of massage or that she has worked with massage therapy patrons. *See Diviero v. Uniroyal Goodrich Tire Co.*, 919 F.Supp. 1353, 1355 (D.Ariz.1996) (stating "that a court may exclude an expert who does not have the appropriate [background] to offer a helpful opinion with regard to controverted issues").

■ Rule 702 also requires that an expert's testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This standard is one of relevancy and requires the Court to assess "fit", i.e. "whether expert testimony ... is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591, 113 S.Ct. at 2796 (internal quotation omitted). Even if the Marriott established that all the information in Dr. McClellan's report is reliable, the report does not "assist the trier of fact" in determining whether sex is a BFOQ for massage therapists at the Marriott. Dr. McClellan opines that sexual abuse survivors should be allowed to choose the gender of their massage therapists. However, the Marriott is basing its BFOQ request on customer privacy, not choice. Moreover, neither Dr. McClellan nor any of the Marriott's other witnesses offer evidence of the percentage of sexual abuse survivors who seek massages generally, or at the Marriott specifically. Absent such information, a BFOQ cannot be justified on the need for choice by sexual assault survivors. Moreover, even if the Marriott provided this information, the evidence does not support a BFOQ for massage therapists working with the remaining clients, who are likely, assuming the reliability of the statistics McClellan cites, to be the vast majority of the Marriott's Spa clients.

■ Finally, Dr. McClellan's citation to the study indicating that "any form of touch can trigger kinesthetic memories of abuse", (McClellan Op. at 4), is irrelevant due to the rationale underlying the Marriott's BFOQ request. The Marriott argues that clients should be given a therapist of the gender they prefer, but customers whose kinesthetic memories may be awakened by touch do not have the memory of sexual abuse necessary to request, in advance, a therapist of the sex opposite to that of their abusers. The evidence also is irrelevant because

---

1. The *Daubert* factors are (1) whether the theory or technique has been tested, (2) whether the theory or technique "has been subjected to peer review and publication", (3) whether the technique has a high "known or potential rate of error", and (4) whether the theory or technique is generally accepted within a "relevant scientific community". *Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–97. In *Kumho Tire Co.*, 119 S.Ct. at 1175, the Supreme Court concluded that these factors may be relevant when examining the reliability of all types of expert testimony.

**1058**

Dr. McClellan does not indicate that gender plays a part in triggering kinesthetic memories through touch, i.e., she offers nothing to indicate that the memories would not be equally triggered by a massage from either a male or female therapist.

Because McClellan's Report contains information that either has not been sufficiently proven to be reliable or is irrelevant, Olsen's Motion to Strike McClellan's expert report will be granted.

## B. Declaration of Joanne DeMark–Paysnoe

■ Olsen also has filed a Motion to Strike the declaration of Joanne DeMark–Paysnoe, senior coordinator for the Marriott's Spa. The declaration sets forth the circumstances that caused the Marriott to implement its sex-based hiring practice. Olsen argues that DeMark–Paysnoe's declaration is not sworn because it contains no notary jurat. However, as the Marriott indicates, the United States Code provisions governing documentary evidence contain a section providing that, whenever sworn declarations are permitted under United States law, an unsworn declaration is also permitted if the declarant executing the declaration within the United States includes the following: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)." 28 U.S.C. § 1746. DeMark–Paysnoe's declaration complies with these requirements.

■ The next basis Olsen asserts for striking the declaration is that DeMark–Paysnoe makes statements about the development of the Marriott's gender-based hiring policy though she is not in a management or policy-making position. This argument for striking the entire declaration fails because DeMark–Paysnoe declares that the statements in her declaration are based on firsthand knowledge she obtained as a Spa Coordinator. As stated below, Olsen will be granted the opportunity to depose DeMark–Paysnoe if this case proceeds forward. If he does so, then he can confirm or controvert DeMark Paysnoe's first-hand knowledge of the matters stated in the declaration.

■ Third, Olsen argues that the Motion should be stricken because the Marriott did not provide DeMark–Paysnoe's name to the EEOC during its investigation, disclose her as a witness in any of its disclosure statements, or present her declaration as part of the record upon filing its original Motion for Summary Judgment. The Marriott's initial summary judgment motion indicates that the Marriott originally did not consider the issue of reasonable alternatives to be relevant—it merely stated that no reasonable alternatives exist due to "the intimate act that requires privacy protection." (Def.'s Mot. for S.J. at 8). However, as the Marriott indicates, the Court's Order denying the parties' initial motions for summary judgment without prejudice to refile expressly instructed the parties to address, in their renewed motions, the issue of whether an employer must consider reasonable alternatives. The Order further stated: "In addition, assuming such alternatives must be attempted, the motions will set forth what, if any, reasonable alternatives the Marriott considered or attempted to implement."

The Order did not address whether the parties could take additional discovery to provide the requested information. Because the discovery deadline had passed, the Marriott should have requested leave to engage in additional discovery. Nonetheless, because the Court requested the information, the Court concludes that it was reasonable for the Marriott to obtain evidence necessary to comply with the request. The Court also notes that the Marriott offered Olsen an opportunity to depose DeMark–Paysnoe. The Court will deny Olsen's request to strike the declaration of DeMark–Paysnoe but will grant Plaintiff leave to depose DeMark–Paysnoe should this action proceed further.

## C. Portions of Olsen's Deposition Testimony

The Marriott has filed a Motion to Strike or Exclude from Consideration portions of Olsen's deposition testimony. In addressing the pending summary judgment motions, the Court found it unnecessary to consider Olsen's deposition testimony. Therefore, the Marriott's Motion to Strike will be denied as moot.

## II. Motion for Summary Disposition

The Marriott also has filed a Motion for Summary Disposition of its (1) Supplemental Motion for Summary Judgment and (2) Renewed Motion to Strike the Testimony of Olsen. The Marriott requests summary disposition on the ground that Olsen did not file a Response to these two Motions. However, Olsen filed a renewed Motion for Summary Judgment on the same date that Defendants filed their supplemental summary judgment motion. The Cross–Motion suffices to set forth Olsen's position, particularly because both parties were addressing questions posed by the Court. A separate Response was not necessary. With respect to the request for summary disposition of the Renewed Motion to Strike, the Court already has concluded that the Motion to Strike is moot because the disputed deposition testimony of Olsen was not considered. The Marriott's Motion for Summary Disposition will be denied.

## DISCUSSION

A motion for summary judgment may be granted if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). To defeat the motion, the non-moving party must show that there are genuine factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In assessing a summary judgment motion, the Court views the evidence in the light most favorable to the nonmoving party and draws any reasonable inferences in the nonmoving party's favor. *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).

## I. Is Gender a Bona Fide Occupational Qualification for the Position of Massage Therapist at the Marriott's Camelback Inn Spa?

Title VII contains a broad proscription of sex discrimination in the workplace.[2] Congress designed the statute to remove "artificial, arbitrary, and unnecessary barriers to employment" that discriminate on the basis of impermissible classifications, including sex. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Marriott, however, argues that its refusal to hire Olsen due to his sex falls within the following statutory exception to the prohibition of sex-based employment discrimination:

> [I]t shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of ... sex ... in those certain instances where ... sex ... is a bona fide occupational qualification ["BFOQ"] reasonably necessary to the normal operation of that particular business or enterprise.

42 U.S.C. § 2000e-2(e)(1). The burden of establishing a BFOQ is on the Marriott. *See Int'l Union, United Auto., Aerospace & Agric. Workers of Am., UAW v. Johnson Controls, Inc. ("Johnson Controls")*, 499 U.S. 187, 206, 111 S.Ct. 1196, 1207, 113 L.Ed.2d 158 (1991); *EEOC v. Boeing Co.*, 843 F.2d 1213, 1214 (9th Cir.), *cert. denied*,

---

**2.** 42 U.S.C. § 2000e–2(a)(1) provides:

It shall be an unlawful employment practice for an employer to fail or refuse to hire ... any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex.

488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 212 (1988).

### A. What are the Legal Standards Governing the BFOQ Defense?

#### 1. "Essence of the Business" Standard

The Supreme Court has repeatedly emphasized that the BFOQ defense is a narrow exception to the general prohibition of sex discrimination contained in Title VII. *Johnson Controls,* 499 U.S. 187, 201, 111 S.Ct. 1196, 1204, 113 L.Ed.2d 158; *Dothard v. Rawlinson,* 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977). The Court bases this conclusion on both the language of the statute and its legislative history. *See Johnson Controls,* 499 U.S. at 201, 111 S.Ct. at 1204. The Court has noted that the statute contains several restrictive terms indicating that the defense applies only in special situations. *See id.* In addition, the Court has relied on the Equal Employment Opportunity Commission's (EEOC's) consistent interpretation of the BFOQ defense as a narrow exception to Title VII's sex discrimination ban. *See Dothard,* 433 U.S. at 334, 97 S.Ct. at 2729 (citing 29 C.F.R. § 1604.2(a)).

In accordance with the narrow scope of the BFOQ defense, a single-sex job classification must relate to the "essence" or "central mission" of the employer's business. *Johnson Controls,* 499 U.S. at 203, 206, 111 S.Ct. at 1205, 1207; *Dothard,* 433 U.S. at 333, 97 S.Ct. at 2729 (quoting *Diaz v. Pan Am. World Airways, Inc.,* 442 F.2d 385, 388 (5th Cir.), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971)). The "essence of the business" inquiry focuses on whether both men and women possess the skills or abilities required to perform the central tasks of the job or the central mission of the employer. *Johnson Controls,* 499 U.S. at 201, 204, 111 S.Ct. at 1204, 1206.

Applying this focus on task-oriented skills in *Johnson Controls,* the Supreme Court found the employer in violation of Title VII for excluding women capable of bearing children from jobs involving exposure to lead at a battery manufacturing plant. *Id.* at 206, 207, 111 S.Ct. at 1207, 1208. Johnson Controls created its discriminatory policy to protect potential fetuses from health risks related to lead exposure but the Court found this an invalid basis for a BFOQ, concluding that "[f]ertile women ... participate in the manufacture of batteries as efficiently as anyone else." *Id.* at 206, 111 S.Ct. at 1207. The job of making batteries, not concern about the welfare of the next generation, constituted the "essence" of Johnson Controls' business. *Id.* at 206, 111 S.Ct. at 1207.

#### 2. "Essence of the Business" Standard When Privacy is the Basis of the BFOQ Defense

Although the inquiry into whether sex constitutes a BFOQ usually focuses on key job skills or the employer's central mission, courts also have found an employee's sex to be a BFOQ in certain situations in which a customer's or client's bodily privacy interests might otherwise be compromised. *See, e.g., Jennings v. New York State Office of Mental Health,* 786 F.Supp. 376, 380 (S.D.N.Y.) (privacy-based BFOQ exists for position of treatment assistant at state hospital for the mentally ill, a position involving intimate personal care such as bathing and toileting), *aff'd,* 977 F.2d 731 (2nd Cir.1992) (*per curiam*); *Fesel v. Masonic Home of Del.,* 447 F.Supp. 1346, 1351 (D.Del.1978) (privacy-based BFOQ exists for position of nurse at small retirement home, a position involving dressing and bathing elderly nursing home patients), *aff'd w'out opinion,* 591 F.2d 1334 (3rd Cir.1979). Protection of client bodily privacy is the rationale the Marriott offers in support of its argument that sex is a BFOQ for the position of massage therapist at the Camelback Inn in proportion to client requests for a female therapist.

Responding to the dissent in *Johnson Controls,* the Supreme Court stated that privacy remains a valid inquiry in BFOQ

analyses. 499 U.S. at 206 n. 4, 111 S.Ct. at 1205 n. 4. However, because privacy interests were not at issue in *Johnson Controls*, the Supreme Court provided no further explanation of how to tailor to the privacy context the "essence of the business" standard generally focused on ability to perform central job tasks or effectuate the employer's central mission.

The Ninth Circuit has had only one occasion to address a privacy-based BFOQ. *See Robino v. Iranon*, 145 F.3d 1109 (9th Cir.1998). In *Robino*, officials at a women's prison in Hawai'i decided to implement a female-only hiring policy for six of the forty-one corrections officer positions at the prison, to protect inmates and prevent allegations of sexual misconduct. 145 F.3d at 1110–11. The Ninth Circuit addressed the BFOQ argument only in the alternative because it concluded that a policy applicable to only six of forty-one corrections officer positions placed so few restrictions on males' employment opportunities that the BFOQ analysis was unnecessary. *Id.* at 1110. Moreover, in concluding that sex constituted a BFOQ for the six positions, the Ninth Circuit deferred to the professional judgment of Hawai'i prison officials. *Id.* at 1110–11. Because the court was required to defer to prison officials' judgment, it did not need to determine whether and how to tailor the "essence of the business" standard to a privacy-based BFOQ analysis.

Examination of a number of privacy-based BFOQ cases decided prior to *Johnson Controls* reveals that, when privacy is the issue, the "essence of the business" inquiry focuses not on whether both men and women are physically capable of performing job tasks central to the employer's mission, but on whether performance of those central tasks intrudes upon the privacy rights of opposite-sex third-parties, whether patients, inmates, or clients. *See, e.g., Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079 (8th Cir.1980) (detailing necessary job tasks of correctional officers and concluding that the tasks implicate inmates' privacy interests), *implicitly overruled in part on other grounds by*

*Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Backus v. Baptist Med. Ctr.*, 510 F.Supp. 1191, 1193 (E.D.Ark.1981) (detailing necessary job tasks of nurses at retirement home and concluding that the tasks implicate residents' privacy interests), *vacated as moot*, 671 F.2d 1100 (8th Cir. 1982); *Fesel*, 447 F.Supp. at 1352–53 (same).

Cases decided following *Johnson Controls* indicate that the approach taken in these earlier privacy-based BFOQ decisions remains valid. In a 1992 decision, a district court in New York took the same approach of determining whether central job tasks intrude upon third-party privacy rights. *Jennings*, 786 F.Supp. at 380–82. In a second 1992 decision, a district court in Minnesota concluded that the footnote in *Johnson Controls* confirming the ongoing validity of privacy-based BFOQ claims suggests that privacy can be central to the mission of an employer. *Hernandez v. University of St. Thomas*, 793 F.Supp. 214, 216 (D.Minn.1992). As the district court explained, the Supreme Court stated that safety considerations justified a BFOQ defense only when those "considerations ... went to the core of the employee's job performance ... [and] that performance involved the central purpose of the enterprise." *Hernandez*, 793 F.Supp. at 216 (quoting *Johnson Controls*, 499 U.S. at 203, 111 S.Ct. at 1206). Likewise, privacy justifies a BFOQ defense only when privacy concerns go to the core of employee job performance involving the central purpose of the enterprise. *Id.*

The approach taken by courts both prior to and following *Johnson Controls* appropriately adapts the "essence of the business" standard, employed by the Supreme Court in *Johnson Controls* and by the Ninth Circuit, to the privacy context. Accordingly, the Marriott must establish that the core job functions of the massage therapist position intrude upon or invade privacy interests and that a single-sex BFOQ is necessary to protect those interests. *Her-*

*nandez*, 793 F.Supp. at 217; *Jennings*, 786 F.Supp. at 380.

### 3. Cases Illustrating Intrusions on Privacy

Most privacy-based BFOQ requests occur when employees in the position at issue perform legitimate job duties requiring that they intrude upon the privacy interests of a third party by, at minimum, viewing the third party completely naked. Several courts analyzing privacy-based BFOQ requests have described the interest in bodily privacy by quoting language from a decision of the Ninth Circuit:

> We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.

*Local 567, Am. Fed. of State, County, & Mun. Employees AFL–CIO v. Michigan Council 25, AFSCME*, 635 F.Supp. 1010, 1013 (E.D.Mich.1986) (quoting *York v. Story*, 324 F.2d 450 (1963), *cert. denied*, 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964)); *Brooks v. ACF Industries, Inc.*, 537 F.Supp. 1122, 1131 (S.D.W.Va.1982) (same); *Backus*, 510 F.Supp. at 1193 (same). Often, employees working in positions that intrude on privacy perform legitimate job duties involving an even greater degree of intrusion than the viewing of a person of the opposite sex unclothed. Such duties might include viewing the third party toileting or touching the third parties' genitalia for legitimate purposes such as bathing. *See, e.g., Jennings*, 786 F.Supp. at 382–83.

The decisions cited by the parties, and additional decisions located by the Court, outline the contours of the privacy interests recognized by courts. Treatment assistants at a state psychiatric hospital intrude on patients' privacy by performing duties involving intimate personal care such as "assisting patients with toileting, disrobing, showering and cleaning their genitals," as well as stripping patients before placing them into restraints and conducting bed checks of patients who sleep naked or whose nightwear comes off during sleep. *Id.; see also Healey v. Southwood Psych. Hosp.*, 78 F.3d 128, 133 (3rd Cir.1996) (BFOQ found when duties of child care specialists at a psychiatric hospital included accompanying children to the bathroom and occasionally bathing them); *Local 567, AFSCME*, 635 F.Supp. at 1013 (BFOQ found when tasks of workers at a state psychiatric institution include "personal hygiene care").

Prison guards intrude upon inmates' privacy interests by performing duties entailing viewing members of the opposite sex unclothed, such as guarding inmates in exposed toilet and shower areas and conducting nighttime room checks. *See Robino*, 145 F.3d at 1111; *Torres v. Wisconsin Dept. of Health & Social Servs.*, 859 F.2d 1523, 1530 (7th Cir.1988), *cert. denied*, 489 U.S. 1017, 109 S.Ct. 1133, 103 L.Ed.2d 194 (1989). As the Ninth Circuit stated: "[A] person's interest in not being viewed unclothed by members of the opposite sex survives incarceration." *Robino*, 145 F.3d at 1111.

Nurses intrude upon privacy interests of patients in a small retirement home by performing duties including dressing and bathing elderly nursing home patients, as well as changing pads used by incontinent patients and assisting patients in use of toilets and bed pans, *Fesel*, 447 F.Supp. at 1353. Labor and delivery-room nurses intrude upon patients' privacy interests because the nurses view constantly exposed genitalia and perform duties including checking the cervix of a woman in labor and sterilizing the laboring woman's vaginal area. *Backus*, 510 F.Supp. at 1193.

Janitors intrude on legitimate privacy interests by cleaning workplace bathhouses wherein male employees undress, shower, and use urinals, at least when the size of the workforce precludes cleaning while the bathhouse is empty. *Brooks*, 537 F.Supp. at 1125; *see also Norwood v. Dale Maint. Sys., Inc.*, 590 F.Supp. 1410, 1417 (N.D.Ill.1984) (BFOQ found when janitors

could view men urinating in washroom, in workplace where washroom was in almost continuous use due to size of the workforce). Finally, plaintiffs created a genuine issue of material fact about whether health club employees intruded upon privacy interests of clientele by performing duties involving exposure to partial or complete nudity in showers, locker rooms, and exercise rooms, as well as touching of clients' breasts, inner thighs, buttocks, and crotch areas while taking measurements and providing instructions on equipment. *EEOC v. Sedita*, 816 F.Supp. 1291, 1295 (N.D.Ill.1993).

Although all of these decisions involve legitimate job duties that necessitated viewing or touching of genitalia, one court found a genuine issue of material fact regarding existence of a BFOQ in a situation in which viewing genitalia was only a possibility. A janitor challenged a university's new rule of hiring only janitors of the same sex as the residents in dormitories in which communal bathrooms are separated from sleeping quarters by public hallways. *Hernandez*, 793 F.Supp. at 215. Unlike nurses bathing nursing home residents, a dormitory janitor need not view nudity to perform his or her job absent evidence that restrooms are in continuous use. Nonetheless, the court concluded that a genuine issue of material fact existed with respect to whether "intrusions on legitimate privacy interests are an essential part of maintaining a college dormitory with communal bathrooms." *Id.* at 218.

### B. Is the Marriott's BFOQ Request Based on Privacy or Customer Preference and Profitability?

#### 1. Distinguishing Privacy From Customer Preference

██ The BFOQ requested in the instant action differs from privacy-based BFOQs in all the cases set forth above. The Marriott does not argue that each client should be provided with a massage therapist of the same sex as the client due to the intrusion upon clients' privacy interests. Rather, it argues that each client should be allowed to choose the sex of their massage therapist due to the intrusion upon clients' privacy interests. The Marriott does not quarrel with customers who select a therapist of the opposite sex, whether male or female—it has even encouraged female clients to consider male therapists if no female therapists are available at a requested time. Thus, the Marriott argues for a BFOQ based on customer preference rather than privacy.

That customer preference, rather than privacy, underlies the Marriott's argument is confirmed by the evidence the Marriott offers in support of its request for summary judgment, evidence repeatedly describing the issue as one of customer preference and business need. For example:

> The Marriott Camelback Inn Spa employs massage therapists based on actual and predictable customer requests and preferences for gender of massage therapists. The Spa does not have any blanket prohibition against hiring male massage therapists, but instead fills vacant positions with males or females, depending on customer demand and business needs.

(Wilfong Aff. at ¶ 7, Def.'s Exh. 12). Another defense expert indicates:

> [In a Spa Management magazine survey,] 72% of the respondents preferred female therapists, while 18% indicated no preference between female and male therapists.... Guest preference thus influences the hiring process of massage therapists. It is important to hire in this fashion to maintain business.

(McCaffrey Op. at 6, Def.'s Exh. 1). This expert adds:

> The spa business is a referral business. If guest requests are not honored, the ability to stay in business is seriously jeopardized. Guest preference must be taken into consideration and must influence the hiring process of massage therapists. It is important to hire in a manner that allows the space to accommodate the guests' needs to maintain and develop business.

. . .

Since one is in the spa business to please and relax people, it is essential to ask the customer if they have a preference as to the gender of their therapist. If a therapist is assigned without asking the guest if the gender is suitable, the spa encounters problems that result in lost business.

(*Id.* at 4).

The court has concluded that the report of the Marriott's expert witness psychologist, Dr. McClellan, is inadmissible, but even if it was admissible, the report merely confirms that customer preference, not privacy from the opposite sex, is the basis for the Marriott's request. After discussing the impact of past sexual abuse on the massage experience, she states:

Given the great number of women and men who have been sexually abused, and the devastating aftermath of such experiences, *having the right to select the gender of the massage therapist seems imperative.* The need for a safe place where one is not exposed to the dominate and submission process is imperative. The only way to make that possible is for people to have choices. Without choice there is a potential for the reenactment of trauma.

(McClellan Op. at 5 (emphasis added), Def.'s Exh. 5). Dr. McClellan also states that the majority of perpetrators of sexual abuse are men, thereby indicating that the majority of sexual abuse survivors of both sexes may prefer female massage therapists and a minority of sexual abuse survivors of both sexes may prefer male massage therapists. (*Id.* at 3). Finally, Dr. McClellan concludes, "It seems clear to me that one should be allowed to choose the gender of a massage therapist." (*Id.* at 5).

Several of the stipulations contained in the parties' "Joint Stipulated Statement of Undisputed Facts" ("JSSUD") further confirm the customer-preference basis for the Marriott's BFOQ request. These paragraphs, as numbered in the JSSUD, provide:

30. Plaintiff testified that if a person does not feel comfortable with the gender of their therapist, that is their right, and the whole idea of getting a massage is to get a comfortable massage that is safe, secure, and provides relaxation.

. . .

42. It is essential when booking a massage that the client's preference and request of the gender of the massage therapist be honored.

. . .

47. Plaintiff testified that he believes that patrons and clients of a spa have a choice. They can choose who they want to give them a massage. . . .

48. Plaintiff testified that he has "no problem . . . . at all" with a client's right to prefer a male or female massage therapist, or with defendant's decision to honor the request of a client.

49. Plaintiff testified that if a client does not want a particular gender of massage therapist, there is no reasonable way to accommodate them. According to plaintiff, anybody is entitled to state their preference for gender.

(JSSUD (internal citations omitted)). All of these comments pertain to customer preference, confirming the basis of the Marriott's request. An additional paragraph in the JSSUD provides:

29. Plaintiff testified that one reason some individuals choose a particular gender for massage therapists is because they are homophobic.

(JSSUD (internal citations omitted)). This statement also supports the customer preference rationale rather than the privacy rationale by noting that some clients may prefer a therapist of the opposite sex.

In contrast to the BFOQ based on customer preference requested by the Marriott, the privacy-based BFOQ decisions discussed above are grounded in the determination that staffing a position entirely with members of the same sex as that of the patient, client, or inmate is justified because performing the position entails in-

trusion into the legitimate, narrowly-circumscribed, privacy interests of those individuals. *See, e.g., Robino,* 145 F.3d at 1111; *Healey,* 78 F.3d at 133; *Brooks,* 537 F.Supp. at 1128; *Fesel,* 447 F.Supp. at 1351. A BFOQ based on customer preference is inconsistent with a BFOQ based on the conclusion that everyone filling a particular position must be a member of one sex because core job requirements invade the privacy of clients. The customer preference rationale also diminishes the argument that privacy concerns require the use of therapists who are the same sex as their clients—if clients are allowed to choose, it is unnecessary that the client and massage therapist be of the same sex.

Courts have consistently rejected requests for a BFOQ based on customer preference. The Fifth Circuit rejected a BFOQ based on customer preference in the very first decision to conclude that the focus of the BFOQ inquiry must be on the "essence of the business". *See Diaz v. Pan Am. World Airways, Inc.,* 442 F.2d 385 (5th Cir.), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). In *Diaz,* Pan Am argued that being female was a BFOQ for the position of flight attendant partly due to customer preference. The district court agreed with Pan Am, and, as the Fifth Circuit explains:

> The trial court also found that Pan Am's passengers overwhelmingly preferred to be served by female stewardesses. Moreover, on the basis of the expert testimony of a psychiatrist, the court found that an airplane cabin represents a unique environment in which an air carrier is required to take account of the special psychological needs of its passengers. These psychological needs are better attended to by females.

*Diaz,* 442 F.2d at 387. In rejecting this customer preference rationale, the Fifth Circuit relied in part on EEOC guidelines stating that "a BFOQ ought not be based on 'the refusal to hire an individual because of the preferences of co-workers, the employer, clients or customers ....'" *Id.* at 389 (quoting 29 C.F.R. § 1604.1(iii)). This regulation remains in effect at 29 C.F.R. § 1604.2(a)(1)(iii).

In a provision subsequently quoted by the Ninth Circuit, the Fifth Circuit added:

> While we recognize that the public's expectation of finding one sex in a particular role may cause some initial difficulty, it would be totally anomalous if we were to allow the preferences and prejudices of the customers to determine whether the sex discrimination was valid. Indeed, it was, to a large, extent, these very prejudices the Act was meant to overcome. Thus, we feel that customer preference may be taken into account only when it is based on the *company's inability to perform the primary function or service it offers.*

*Diaz,* 442 F.2d at 389 (quoted in *Gerdom v. Continental Airlines Inc.,* 692 F.2d 602, 609 (9th Cir.1982) (emphasis added), *cert. denied,* 460 U.S. 1074, 103 S.Ct. 1534, 75 L.Ed.2d 954 (1983)). The Fifth Circuit ultimately concluded that being female was not a BFOQ for the position of flight attendant.[3] *See id.* In accordance with *Diaz,* the Ninth Circuit has consistently rejected a BFOQ based on customer preference for the members of one sex. *See Lam v. University of Hawai'i,* 40 F.3d 1551, 1560 n. 13 (9th Cir.1994); *Gerdom,* 692 F.2d at 609; *Fernandez v. Wynn Oil Co.,* 653 F.2d 1273, 1276–77 (9th Cir.1981).[4]

---

**3.** At the hearing on the Motions for Summary Judgment, the Marriott argued that *Diaz* is distinguishable because privacy was not the basis for the requested BFOQ. However, as this Court already explained, privacy is not the basis for the BFOQ requested by the Marriott either—the basis is customer preference.

**4.** In noting that courts consistently have rejected a BFOQ based on customer preference, this Court does not disregard or trivialize the Marriott's emphasis on the importance of customer preference to its success in the massage business. It is worth noting, however, that a sex-neutral hiring policy does not necessarily preclude honoring any one client's request for a therapist of one gender or another.

### 2. Distinguishing Privacy From Profitability

Closely related to its concerns about fulfilling customer preference are the Marriott's concerns about the Spa's income. As indicated from the Marriott's evidence quoted above, the company repeatedly refers to the potential financial ramifications of eliminating its sex-based hiring policy. One of the Marriott's experts opines, "If a therapist is assigned without asking the guest if the gender is suitable, the spa encounters problems that result in lost business." (McCaffrey Op. at 4, Def's. Exh. 1). The focus on revenue is further confirmed by the Marriott's practice of encouraging clients to use a massage therapist of the opposite sex when a therapist of the same sex is unavailable.[5]

The Marriott's focus on revenue is confirmed by the following portions of the JSSUD:

51. If a spa was not allowed to take into account the gender of the therapist to be hired, it would have a severely adverse impact on revenues. To be successful in the spa business, it is necessary for a spa to consider gender in hiring massage therapists.

52. If a spa assigns a therapist without asking the guest as to which gender is suitable, the spa will encounter problems that result in lost business.

. . .

54. The spa business is a referral business. If guests' requests are not honored, the ability to stay in business will be severely jeopardized.

55. If a resort spa does not inquire as to the guest's preference as to the gender of the massage therapist and/or if the guest's requests are not honored, the spa loses money, profits decrease, guests will go elsewhere where their requests are honored, and the spa will develop a bad reputation as a result of word-of-mouth in the industry.

(JSSUD (citations omitted)).

▮ Due to financial concerns, the Marriott argues that its sex-based hiring practice is justified by business necessity. However, the defense of business necessity is not available in disparate treatment cases such as this. *Jeldness v. Pearce*, 30 F.3d 1220, 1230 (9th Cir.1994); *see also Johnson Controls*, 499 U.S. at 199, 111 S.Ct. at 1204. Only the more-stringent BFOQ defense is available. *Id.*

▮ In assessing whether a BFOQ defense exists, the cost of eliminating the sex-based hiring policy is usually irrelevant. The extra cost of employing members of the previously-excluded sex "does not provide an affirmative Title VII defense for a discriminatory refusal to hire members of that gender", with the possible exception of situations in which the cost would be "so prohibitive as to threaten the survival of the employer's business," *Johnson Controls*, 499 U.S. at 210, 111 S.Ct. at 1209. The Marriott does not set forth admissible evidence indicating that a sex-based hiring policy would "threaten the survival" of its Spa. Absent such evidence, "economic considerations . . . cannot be the basis for a BFOQ—precisely those considerations were among the targets of the act." *EEOC v. County of Los Angeles*, 706 F.2d 1039, 1042 (9th Cir.1983) (considering age-based BFOQ), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).

Because economic considerations are virtually never a factor, the Ninth Circuit rejected the argument that being male was a BFOQ for an executive position with an

---

5. Joanne DeMark–Paysnoe, a Spa Coordinator who schedules customer appointments, declares:

If the requested gender of therapist is not available for the date and time of the requested appointment, the Spa's Coordinators are trained to ask the guests if they would prefer a massage by the other gender of therapist. The situation most frequently occurs when a guest requests a female therapist but [none are] available. In these situations, the Spa's Coordinators are trained to encourage the guests to accept a massage by the other gender of therapist . . . .

(DeMark–Paysnoe Dec. at ¶ 16).

international corporation. *Fernandez*, 653 F.2d at 1274, 1276–77. The corporation argued that some customers based in foreign nations would refuse to transact business with a woman, but the Ninth Circuit concluded that potential lost revenue did not justify sex discrimination. *See id.* Accordingly, potential lost revenue does not justify the Marriott's sex-based hiring practice.

### 3. Lack of Evidence that the Marriott's Customers' Preferences are Based on Privacy

Even if a BFOQ could be recognized for customer preference based on privacy, the Marriott has not offered evidence to create a genuine issue of material fact with respect to whether privacy interests are the reason its clients choose female massage therapists far more often than males. The Marriott utilizes customer preference as a proxy for privacy concerns on the assumption that privacy concerns are the basis for its customers' preferences, but it offers little reliable evidence in support of this assumption.

Some of the Marriott's evidence is contrary to the notion that its customers' preferences, or those of massage clients generally, are based on privacy concerns. For example, the evidence that men, as well as women, prefer female massage therapists creates significant uncertainty and ambiguity about whether a desire for privacy from the opposite sex is the sole consideration motivating customer choice. (McCaffrey Op. at 2; Def.'s Exh. 1; Wilfong Aff. at ¶ 4, Def.'s Exh. 12). The inadmissible report of Dr. McClellan, proffered by the Marriott, confirms that customer preference can be based upon several factors. Through Dr. McClellan's report, the Marriott attempts to establish that "[b]oth men and women have various views as to the gender of the therapist and which gender makes them more comfortable and safe. Life experience can contribute to these views and is a complex process." (McClellan Op. at 2, Def.'s Exh. 5).

Life experiences upon which customer preferences are based even could include past experience with the female therapists employed by the Marriott in a far greater percentage, i.e., the discriminatory practice of hiring mostly female message therapists could be shaping customers' future expectations. Courts consistently recognize that past discriminatory practices can affect the racial or gender make-up of a work force. *See e.g., United States v. Paradise*, 480 U.S. 149, 167–69, 107 S.Ct. 1053, 1064–65, 94 L.Ed.2d 203 (1987); *Davis v. City and County of San Francisco*, 890 F.2d 1438, 1445 (9th Cir.1989), *cert. denied sub nom., San Francisco Fire Fighters Local 798 v. City and County of San Francisco*, 498 U.S. 897, 111 S.Ct. 248, 112 L.Ed.2d 206 (1990) (NO. 90–248).

In its Response to Plaintiff's Renewed Motion for Partial Summary Judgment, the Marriott argues that Olsen stipulated that guests have a privacy interest giving them "the right to choose the gender of the[ir] massage therapist". (Def.'s Response at 2–3). The Marriott overstates the import of Plaintiff's stipulations. The JSSUD cited by the Marriott for support contains only two paragraphs with potential relevance to the issue of privacy. One of these provides:

28. Plaintiff testified that some people may be self-conscious about their bodies, may have cellulite, may have scars, and these are legitimate reasons why they would not want to be nude with a person of the opposite gender.

(JSSUD (internal citations omitted)).

Significantly, paragraph 28 is the only paragraph indicating that, for one of the three listed reasons, some massage clients have "legitimate reasons why they would not want to be nude with a person of the opposite gender". Privacy from the opposite sex is the only type of privacy interest that has been recognized by courts as a valid basis for a BFOQ.

The stipulation in paragraph 28 does not overcome the problem that the Marriott is arguing for a BFOQ based on customer

preference, not privacy, and relying on privacy as only one of several bases for customers' requests. Even if the Marriott was arguing for a BFOQ based on privacy, the stipulated paragraph quoted above indicates only that *"some"* clients *"may* be self-conscious about their bodies, *may* have cellulite, [and] *may* have scars" and that these are "legitimate reasons why they would not want to be nude with a person of the opposite gender." The statement that *some* clients *may* have the listed concerns establishes neither that all massage clients have a privacy interest, nor that some or all of the Marriott's clients have a privacy interest.

The other stipulated paragraph with potential relevance provides:

27. Plaintiff testified that there are legitimate reasons why people would not want to be massaged by the opposite sex.

This paragraph is conclusory; moreover, it indicates that clients may have several legitimate reasons for not wanting a massage from a therapist of the opposite sex—other evidence provided by the Marriott and discussed above indicates that privacy is only one of these reasons.

The Marriott argues that courts deciding other BFOQ privacy cases have assumed that a privacy interest exists whenever the naked bodies or genitalia of patients, clients, or inmates are exposed to employees. As will be discussed *infra,* the intrusion on privacy in the massage context, if any, is far less. Moreover, in the privacy cases, the employers made the decision that privacy concerns necessitated a bright-line practice of hiring only employees of the same sex as the customer, client, inmate, or patient with whom they worked. Neither customer, client, inmate or patient was given a choice. In contrast, when customer preference is accommodated, the choice of one sex or another may, as the Marriott has established, be based on any number of grounds—both legitimate and illegitimate. Privacy cannot be assumed to be the basis of a customer's choice.

### 4. Conclusion

The Marriott's argument, that being female is a BFOQ to the extent that customers request female massage therapists, is based neither on inability of men to fulfill core job functions nor on the notion that core job functions intrude upon privacy interests and require assignment of clients to massage therapists of the same sex. The Marriott's request, if granted, would result in an unprecedented and improper expansion of the BFOQ defense untethered by any objective limitations related to job functions or privacy concerns and constrained only by customer preference, whatever its basis. Courts, including the Ninth Circuit, have rejected such expansive interpretations of the BFOQ defense. This Court does so as well. Olsen's Motion for Summary Judgment on the issue of liability for discriminatory failure to hire will be granted, and the Marriott's Motion denied.

### C. If the Preference of Some Customers is Based on Privacy, Has the Marriott Established the Necessity of a BFOQ?

In the alternative to concluding that the Marriott's BFOQ defense fails because it is based upon customer preference rather than privacy, the Court also will determine whether the Marriott has established the necessity for a privacy-based BFOQ.

■■■ Courts have employed either a three-factor or a two-factor test to assess the validity of a privacy-based BFOQ. When stated in three parts, the test requires the employer to establish that (1) it has a factual basis for believing that it is necessary to staff the position at issue with people of the same sex as patients, clients, or inmates, in order to protect the privacy interests of the latter; (2) the asserted "privacy interest is entitled to protection under the law," and (3) "no reasonable alternatives exist to protect those interests other than the gender[-]based hiring policy." *Jennings,* 786 F.Supp. at 380–81. *See also Sedita,* 816 F.Supp. at 1295 (set-

ting forth similar test). When stated in two parts, the test requires the employer to establish that (1) legitimate privacy rights of patients, clients, or inmates "would be violated by hiring members of one sex" to fill the position at issue, and (2) "there are no reasonable alternatives to a sex-based policy." *Hernandez,* 793 F.Supp. at 216. In setting forth the respective tests, both *Sedita,* 816 F.Supp. at 1295, and *Hernandez,* 793 F.Supp. at 216, cite, among other decisions, *Norwood,* 590 F.Supp. at 1415–16. Each test results in the same inquiry—the first prong of the two-factor test merely combines the first two prongs of the three-factor test. The Court will proceed to apply the two-factor test.

### 1. Whether Core Job Functions of Marriott's Massage Therapists Intrude Upon or Invade Privacy Interests

By honoring customer preference, the Marriott essentially admits that privacy from the opposite sex is not its basis for assigning a massage therapist. To the extent that privacy is even potentially a concern, the Court notes that massages at the Marriott's Spa are significantly different from the intrusions into privacy detailed in the cases set forth above, with the possible exception of *Hernandez,* 793 F.Supp. at 217–18. The Marriott's description of the massage process confirms that the legitimate job duties of its therapists do not entail viewing clients while the latter are naked or using the bathroom. A client obtaining a massage at the Marriott is covered by a sheet or towel. (JSSUD at ¶¶ 16–17; Aff. of Marilyn Wilfong at ¶ 15, Def.'s Exh. 12). While massaging a client, the therapist moves aside only a portion of the client's sheet or towel to massage a particular area of the body, such as a leg,

an arm, or the back. (*See* Wilfong Aff. at ¶ 16). When the therapist completes massaging one area, he or she covers the area once again with the sheet or towel prior to moving to another area. (*See id.*).

Although massage at the Marriott involves touching and manipulation of intimate areas such as abdominals and inner thighs, (Wilfong Aff. at ¶ 16), the legitimate job duties of a massage therapist, unlike the duties of the employees in the cases set above, do not include viewing or touching female clients' breasts or either male or female clients' genitalia. (JSSUD at ¶ 18). In fact, a document offered as evidence by Defendants states that therapist "touching or undraping [of a client's] genitals, perineum, ... anus ... or ... breasts" is "sexual abuse". (Sandy Fritz, *Mosby's Fundamentals of Therapeutic Massage* at 32, Def.'s Exh. 18). The Marriott even requires its massage therapists to request permission before massaging a client's buttocks. (Wilfong Aff. at ¶ 11). The massage context is dramatically different from a situation in which legitimate job duties necessitate washing a patient's genitalia or viewing a third-party's genitalia while engaged in tasks such as dressing or otherwise assisting the third party, cleaning workplace bathhouses in continual use by third parties, or guarding bathing and sleeping areas used by a third party.

Massage at the Marriott's Spa also differs significantly from the privacy intrusions detailed above in another respect. The Marriott's clients possess a far greater degree of choice and a far greater amount of control than is possessed by the third parties in the cases set forth above. Prison procedures, not inmate choice, govern when guards may view unclothed inmates. Patients at a psychiatric hospital and elderly residents of a nursing home do not necessarily have a choice about whether to be bathed and, if so, when and under what circumstances.[6] Employees using

---

**6.** Closely related to the lack of choice and control is the fact that many of the third parties in the cases set forth above are vulnerable to exploitation and abuse by those employees who do not limit their touching and viewing to that which is legitimate. Inmates as well as patients involuntarily committed to

psychiatric hospitals are not free to leave if and when unwanted contact takes place. Patients in psychiatric hospitals also may be vulnerable due to their mental illnesses. Patients at a state-run psychiatric center "are just that, patients. They are vulnerable and mentally ill." *Jennings,* 786 F.Supp. at 378.

workplace bathrooms have some control over where and when to do so; however, their choices regarding both place and time are limited. In sharp contrast, the massage client chooses to expose, area by area, portions of his or her body other than genitalia in order to obtain the massage. Moreover, in addition to the rules forbidding genital touching, a client may limit the extent of contact even further by instructing the therapist not to massage certain areas. (*See* Fritz, *Mosby's Fundamentals of Therapeutic Massage* at 29, Def.'s Exh. 18 (discussing client's right to refuse therapist's services)). In fact, a client who so desires may remain clad in underwear.

Although there are significant differences between the setting in which therapists administer massages at the Marriott and the various institutionalized care settings described above, the degree of difference does not mean that massage entails no intrusion into bodily privacy. As indicated above, massage at the Marriott involves touching and manipulation of intimate areas such as abdominals, inner thighs, and, with permission, buttocks. (Wilfong Aff. at ¶ 16). Moreover, as discussed above, Olsen stipulated that:

27. Plaintiff testified that some people may be self-conscious about their bodies, may have cellulite, may have scars, and

these are legitimate reasons why they would not want to be nude with a person of the opposite gender.

(JSSUD (internal citations omitted)). This stipulation indicates that "some" people "may" have privacy interests.

Bodily privacy is inherently a personal matter, not one subject to definitive line-drawing. *See Local 567*, 635 F.Supp. at 1014 n. 7. Thus, the issue of whether massage at the Marriott entails intrusion into bodily privacy is more appropriately resolved after a trial. *Cf. Sedita*, 816 F.Supp. at 1297–1298 (vacating an award of summary judgment to a person denied employment on BFOQ grounds, and concluding that the privacy issue should be resolved at trial). Genuine issues of material fact remain with respect to whether massage at the Marriott intrudes upon some clients' expectations of privacy.

### 2. Whether Reasonable Alternatives Exist For Protecting the Privacy of Marriott's Massage Clients

██ In his Motion, Olsen argues that the Marriott does nothing to alter customer preference for female massage therapists; rather, it perpetuates the problem by asking clients whether they prefer to be scheduled with a male or a female. Olsen further argues that the Marriott has not offered customers the option of selecting

---

Elderly nursing home patients may be vulnerable due to illness, frailty, or decreased cognitive functioning.

Given the increased vulnerability of the resident population, a concern about sexual abuse is frequently one of the real reasons animating a privacy-based BFOQ. *See Robino*, 145 F.3d at 1110–11 (concluding that prison was entitled to designate six guard positions as female-only to protect female inmates's privacy and to prevent abuse by male guards); *Hernandez*, 793 F.Supp. at 218 (in concluding that genuine fact issue remained regarding whether being female is BFOQ for position as janitor in women's dorm, court noted that "peeping incident heightened concern about the presence of unescorted males in the dormitory"); *Jennings*, 786 F.Supp. at 386 n. 14 (finding BFOQ based on privacy, court noted that psychiatric hospital had concerns about both sexual abuse of patients and unfounded

allegations of sexual abuse and concluded: "Given the isolated setting of the bed check, requiring a [treatment assistant] of the same gender as the patient to make the check protects both the patients and the [treatment assistants]"); *Backus*, 510 F.Supp. at 1193 (finding a BFOQ based on privacy and stating that, if a male nurse is present in a delivery room, a female nurse also would have to be present to protect the hospital from charges of molestation).

Although not entirely invulnerable, the vulnerability of the Marriott's massage clients is drastically lower than that of the third parties in these cases due to the Marriott client's ability to set limits on the massage or stop the massage entirely and leave the unlocked room in which the massage occurs if she feels uncomfortable. Their vulnerability also is lower due to the strict rules to which massage therapists must adhere.

massage therapists based on experience or qualifications rather than gender. The Marriott argues that no reasonable alternative to gender-based hiring exists because the service offered, massage, is an intimate act requiring privacy protection. The Marriott also argues that it has tried alternatives but found them unsuccessful.

Although the Ninth Circuit has not addressed the issue, courts analyzing privacy-based requests for a BFOQ both before and after the *Johnson Controls* decision regularly require the employer to prove there are no reasonable alternatives to the sex-based hiring practice. *See Sedita*, 816 F.Supp. at 1295; *Hernandez*, 793 F.Supp. at 216; *Jennings*, 786 F.Supp. at 380–81 & n. 5; *Local 567*, 635 F.Supp. at 1012, 1014; *Norwood*, 590 F.Supp. at 1415–16. Other courts require the employer to establish inability to provide a specific type of reasonable alternative, the rearrangement of either job duties or schedules.[7] *See Healey*, 78 F.3d at 132; *United States v. Gregory*, 818 F.2d 1114, 1118 (4th Cir.), *cert. denied*, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987); *Hardin v. Stynchcomb*, 691 F.2d 1364, 1370–71 (11th Cir.1982); *Gunther*, 612 F.2d at 1086; *Carl*, 883 F.Supp. at 1438 (internal quotation omitted); *Jones v. Hinds Gen. Hosp.*, 666 F.Supp. 933, 935 (S.D.Miss.1987); *Griffin v. Michigan Dept. of Corrections*, 654 F.Supp. 690, 704–705 (E.D.Mich.1982); *Backus*, 510 F.Supp. at 1197; *Fesel*, 447 F.Supp. at 1351. The first group of cases cited, those requiring a showing of no reasonable alternatives, have relied for support on the latter decisions without limiting the evaluation of reasonable alternatives to determination of whether job duties or schedules could be rearranged. *See, e.g., Norwood*, 590 F.Supp. at 1416 (citing *Fesel*); *Hernandez*, 793 F.Supp. at 216 (citing *Backus*, 510 F.Supp. 1191) (additional citations omitted).

In several of the decisions cited, the courts explained the rationale for assigning this burden to the employers. The burden of showing no reasonable alternative to a sex-based hiring practice is borne by the employer in order to ensure that it is impossible to reconcile the general nondiscrimination purpose of Title VII with the privacy rights of clients. *Norwood*, 590 F.Supp. at 1416 (citing *Fesel*, 447 F.Supp. at 1351); *see also Hardin*, 691 F.2d at 1370–71; *Gunther*, 612 F.2d at 1086. This burden is consistent with the narrow scope of the BFOQ defense as interpreted by the Supreme Court in *Johnson Controls* and the focus on the "essence of the business". *Johnson Controls*, 499 U.S. at 201, 203, 111 S.Ct. at 1204–1205. If privacy concerns can be addressed by means other than sex discrimination, then a sex-based hiring policy is not necessary in order for employees to perform core job tasks necessary to effectuate the employer's central purpose or the "essence" of its business. *See Hernandez*, 793 F.Supp. at 217; *Jennings*, 786 F.Supp. at 383. It is also appropriate to place the burden of showing no reasonable alternative on the employer because the BFOQ is an affirmative defense and the employer has the burden of proof. *See Johnson Controls*, 499 U.S. at 206, 111 S.Ct. at 1207. For these reasons, this Court, like those cited above, will require the Marriott to establish that no reasonable alternatives exist to its policy of hiring based on sex.

Some of the decisions cited above provide examples of the alternatives employers and courts have considered before concluding that gender was a valid BFOQ. In *Jennings*, 786 F.Supp. 376, the defendant New York State Office of Mental Health

---

7. The Court has located one decision in which it is not clear whether a court considered the burden of proof of reasonable alternatives, or lack thereof, to be plaintiffs' or defendants' burden. The court considered alternatives suggested by the plaintiff, and then considered whether it could "ideate any reasonable scheme or accommodation" on its own, but did not discuss which party had the burden of proof on this issue. *See Brooks*, 537 F.Supp. at 1132.

("OMH"), established, on a motion for summary judgment, that sex was a valid BFOQ for the position of treatment assistant at one of its hospitals. Due to patients' physical needs, the hospital could not discover any alternative other than temporary rescheduling. *Jennings*, 786 F.Supp. at 385–86. However, the defendant offered evidence that temporary reassignment of workers of the same gender would be highly impracticable due to both the time this option would take and the frequency with which it would be used. *Id.* at 385. Such temporary reassignment would reduce the efficiency of operations and the hospital's ability to assure the privacy of patients in emergencies. *Id.*

The plaintiffs in *Jennings* also made suggestions about alternatives. Plaintiffs suggested that curtains be placed on observation windows of bedrooms, but the court concluded that this would not address the privacy needs of patients requiring either continual observation or assistance in undressing. *Id.* at 386. The plaintiffs also suggested that patients be given pajamas to wear to eliminate privacy concerns during bed checks. However, the court concluded that mentally ill patients may not have the capacity to control their behavior or to understand the ramifications of choosing not to wear pajamas. *Id.*

In *Fesel*, 447 F.Supp. 1346, the defendant nursing home established at trial that there was no reasonable alternative to the policy of hiring only females as nurse's aides. Although some scheduling changes could be made to reduce the time each nurses aide worked alone, an aide would still have to work alone at least four hours per week. *Id.* at 1353. Due to the small size of the nursing home and its staff, it was impossible to adjust schedules or job tasks to hire a male aide who would not be required to provide intimate physical care to female patients. *Id.* Sex was a BFOQ in "these narrow circumstances". *Id.* at 1354.

In both its original and supplemental Motions for Summary Judgment, the Marriott argued that no reasonable alternative to gender-based hiring of massage therapists exists "because the essence of the service offered is the intimate act that requires privacy protection." (Def.'s Mot. for S.J. at 8; *see also* Def.'s Supp. Mot. for S.J. at 5). The Marriott's argument assumes that privacy is the sole basis for the BFOQ it requests, rather than customer preference that may stem, in some instances, from privacy interests. Because the Marriott's request rests on a customer preference rationale, it is necessary to determine, at minimum, whether the Marriott considered reasonable alternatives to distinguish clients with legitimate privacy concerns from those whose preference is based on a different rationale, such as lack of familiarity with the massage process.

The primary alternative Olsen suggests is that the Marriott stop asking whether clients would prefer a male or female massage therapist when scheduling massages and provide instead a brief description of the therapists' qualifications. In response, DeMark–Paysnoe declares, "When the Spa opened in 1989 and throughout the early 1990s," the Spa's staff did not ask clients scheduling appointments whether they preferred a male or female massage therapist. (DeMark–Paysnoe Dec. at ¶ 9). She explains why the process changed:

[During the time that no inquiry was made into gender preference], the Spa experienced countless complaints by both men and women guests when they arrived for their massage appointment and were not happy with the gender of the massage therapist assigned to them. Many women complained that they did not want to be massaged by male therapists. Other women complained that they did not want to be massaged by female therapists. We experienced the same problems with the male guests. ... A number of the guests expressed that they were upset the Spa did not care enough to even inquire whether they had a gender preference. Virtually all of these guests demanded that we

immediately reassign them to the gender of therapist of their choice so they could get their massage. However, by the time the guests arrived for their massage appointment, it was almost always too late to ... accommodate [them]. Many guest ended up canceling their appointments.

...

Because of these numerous and consistent guest complaints, the Spa's Coordinators and the Spa's management decided that it was better for the guest, the therapists and the Spa to find out if the guests had a gender preference for their massage therapist at the time they scheduled their massage appointments. ... After the Spa's Coordinators began asking guests if they had a preference for [a] male or [a] female therapist, the number of guest complaints and canceled appointments dropped dramatically.

(*Id.* at ¶¶ 10–11, 13–14). She also sets forth other information the Spa Coordinators are able to provide:

The Spa's Coordinators are further trained to answer questions and/or further volunteer information about the massage experience itself, particularly if they believe or know that the guest never has had a massage before, which often is the case. The Coordinators are trained to describe the massage setting and the fact that the guests remain draped by a sheet or towel, except for that portion of their body that is being massaged. The Coordinators also frequently tell the guests that they may instruct the therapists where they may and may not touch them or how deep[ly] or soft[ly] to touch them. The Coordinators also frequently provide information to guests on the draping procedure and the option of the guests to wear their undergarments during the massage, if they would feel more comfortable.

(*Id.* at ¶ 17). The Marriott does not set forth any other alternatives it has attempted.

The evidence the Marriott offers is insufficient to create a genuine issue of material fact with respect to whether there are reasonable alternatives to the Marriott's sex-based hiring practice. The declaration of DeMark–Paysnoe establishes that not asking about gender caused some problems, but it does not explain the extent of the problems with specificity, merely indicating that complaints were "numerous" and "countless" during a time period vaguely described as "the early 1990s." More importantly, DeMark–Paysnoe does not indicate that the Marriott tried to address the problem in any fashion other than asking clients the gender they preferred in a massage therapist. As Plaintiff argues, the Marriott could have attempted to offer information about therapists' skills and experience. DeMark–Paysnoe declares that, due to call volume, a scheduler cannot provide information on the background of all 47 of the Spa's massage therapists. (DeMark–Paysnoe Dec. at ¶ 18). It seems highly doubtful that all 47 therapists are available every day and all the time; thus providing information of that quantity is unnecessary. However, the Spa could have attempted to provide a very brief explanation of the experience of three or four therapists.

As quoted above, DeMark–Paysnoe sets forth other information that Spa Coordinators can provide, including: the client remains draped by a sheet or towel during the massage except for the portion of their body being massaged, the client can instruct therapists about where they may and may not touch, and the client can wear undergarments during the massage if desired. (DeMark–Paysnoe Dec. at ¶ 17). This information might put a client more at ease about obtaining a massage from a person of the opposite sex, as indicated by the opinion of one of the Marriott's experts, stating: "Women are extremely reluctant to have a male therapist because they don't know the draping procedure." (McCaffrey Op. at 7, Def.'s Exh. 1). However, DeMark–Paysnoe does not indicate that the Coordinators are required to pro-

vide this information; rather, she indicates that the Coordinators only provide this information in answer to questions or at their own discretion, particularly if the client has never obtained a massage before.

The Marriott fails to state that it requires its coordinators to provide any other information that might educate their clients about the massage process and increase their comfort with scheduling an appointment with a massage therapist of the opposite sex. For example, one of the Marriott's experts states that massage therapists are not always properly educated in draping procedures. (McCaffrey Op. at 7, Def.'s Exh. 1). The Marriott could provide training on draping procedures and then inform clients that such training has been provided.

The fact that some information about the massage process is provided orally on a discretionary basis does not establish that providing this information on a standard basis, whether orally or in writing, is not a reasonable alternative, particularly if the Marriott also provided information about therapists' experience and stopped asking clients whether they prefer a male or a female. More information about the process, along with a reduced focus on gender and an increased focus on qualifications, may alter the extent to which clients of both sexes are willing to engage the services of a male, leaving, at most, a subset of clients with particularized privacy concerns, perhaps including sexual abuse survivors.

Because it has not shown that no reasonable alternatives exist, the Marriott has failed to create a genuine, material fact issue on one of the elements of the BFOQ defense. Olsen is entitled to summary judgment on the claim of intentional employment discrimination on this basis in the alternative to obtaining summary judgment on the basis that the Marriott is not asking for a privacy-based BFOQ.

## II. Retaliation

██ After the EEOC found cause to believe that the Marriott discriminated against Olsen based on sex when it refused to hire him, the agency invited the parties to enter a mediation process to attempt to settle their dispute. (EEOC Determination at 2, Pl.'s Exh. 6). During the pendency of this process, in August, 1996, Olsen attended a hotel job fair at Scottsdale Community College and obtained a job application from Marriott's Camelback Inn. Olsen filled out the application and mailed it with a letter to Joy Wilfong on September 2, 1996. (Letter from Olsen to Wilfong, Def.'s Exh. 8).

On October 8, 1996, John Town, then the executive director of The Spa at the Camelback Inn, responded by thanking Olsen for his letter and adding:

> As you may know, settlement discussions into your discrimination claim against Marriott's Camelback Inn have commenced. As such, any further discussions about an employment relationship should be held in abeyance until such time [as] those discussions have been completed.

(Letter from Town to Olsen, Pl.'s Exh. 7). Olsen alleges that Marriott's refusal to consider his application during the pendency of settlement negotiations constituted unlawful retaliation.

██ The relevant portion of Title VII, 42 U.S.C. § 2000e–3(a), provides:

> It shall be an unlawful employment practice for an employer to discriminate against any ... applicants for employment ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or hearings under this subchapter.

To make a prima facie case of retaliatory failure to hire, Olsen must show that (1) he engaged in protected activity, (2) he suffered an adverse employment decision, and (3) a causal link exists between his protected activity and the adverse decision. *Hashimoto v. Dalton*, 118 F.3d 671 (9th

Cir.1997), *cert. denied,* 523 U.S. 1122, 118 S.Ct. 1803, 140 L.Ed.2d 943 (1998); *see also Ruggles v. California Polytechnic State Univ.,* 797 F.2d 782, 786 (9th Cir. 1986). Olsen has shown that he engaged in the protected activity of filing a discrimination charge, and suffered an adverse employment decision by Marriott to hold his application in abeyance. However, he has not satisfied the third requirement of a causal link. John Town avers, and his letter to Olsen states, that the application was held in abeyance because settlement negotiations were ongoing, not because Olsen had filed a charge.

Even if the evidence were sufficient for a prima facie showing, Olsen has not created a genuine issue of material fact with respect to whether the legitimate, nondiscriminatory reason offered by the Marriott for holding the application in abeyance was pretextual. *Ruggles,* 797 F.2d at 786 (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)) (additional citation omitted). Town avers that, during the contemporaneous settlement proceedings, the Spa had requested the EEOC to obtain from Olsen a clarification of his proposed counteroffer communicated on October 1, 1998. (Aff. of John Town at ¶ 4, Def's Exh. 4). In particular, the Spa was unclear about whether Olsen's counteroffer included a demand that he be placed in a massage therapist position. (*Id.*) Having not heard from the EEOC by October 8, Town informed Olsen of the decision to hold his application in abeyance pending the outcome of settlement negotiations. An employer may engage in "[r]easonable defensive measures" during the pendency of a Title VII action. *United States v. New York City Transit Auth.,* 97 F.3d 672, 677 (2nd Cir.1996). Olsen offers nothing to establish that this proffered reason is pretextual.

### III. Punitive Damages

 Both parties request summary judgment on the issue of punitive damages. As amended by the Civil Rights Act of 1991, Title VII provides:

> In an action ... against a respondent who engaged in unlawful intentional discrimination ... the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section ...

42 U.S.C. § 1981a(a)(1). The relevant portion of subsection (b) provides:

> A complaining party may recover punitive damages ... if the complaining party demonstrates that the respondent engaged in a discriminatory practice ... with malice or with reckless indifference to the federally protected rights of [the complainant].

42 U.S.C. § 1981a(b)(1). Construing these provisions in a recent decision, the Supreme Court concluded that Congress imposed two standards of liability—one for obtaining compensatory damages and a second, higher standard for obtaining punitive damages. *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 2124, 144 L.Ed.2d 494 (1999). Thus, the terms "malice" and "reckless indifference" refer not to an employer's knowledge that it is engaging in discriminatory conduct, but to an "employer's knowledge that it may be acting in violation of federal law". *Id.* To act with "reckless indifference", an employer must, at minimum, "discriminate in the face of a perceived risk that its actions will violate federal law." *Id.* at 2125.

Providing examples of cases in which intentional discrimination does not rise to a level warranting punitive damages, the Court states:

> There will be cases ... in which an employer discriminates with the distinct belief that its discrimination is lawful.... [T]he employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability.

*Id.* In such a circumstance, the employer knowingly relies on sex to make an employment decision without acting with

"reckless indifference" to a plaintiff's civil rights. *See id.*

 In arguing that the Marriott should be liable for punitive damages, Olsen relies on evidence that the Marriott continues to consider gender in selecting its massage therapists and continues to ask its clients whether they have a gender preference, despite the EEOC's finding of reasonable cause to believe that the Marriott was engaging in sex discrimination. Olsen has not established that the Marriott's conduct after the EEOC finding is relevant to the issue of whether the Marriott's act of discriminatory failure to hire Olsen justifies an award of punitive damages. Furthermore, Olsen, the party with the burden on this issue, offers no evidence that, at the time the Marriott refused to hire him, it "discriminate[d] in the face of a perceived risk that its actions . . . violate[d] federal law." *Id.* at 2125. Therefore, the Marriott is entitled to summary judgment on this issue.

Accordingly,

**IT IS ORDERED** granting Plaintiff's Renewed Motion to Strike the opinion evidence of Defendant's expert, Dr. Muriel McClellan. (Dkt.# 57).

**IT IS FURTHER ORDERED** denying Plaintiff's Motion to Strike the Declaration of Joanne DeMark–Paysnoe, (dkt.# 70), and granting Plaintiff leave to take the deposition of DeMark–Paysnoe.

**IT IS FURTHER ORDERED** denying as moot Defendant's Renewed Motion to Strike portions of Plaintiff's deposition testimony. (Dkt.# 59).

**IT IS FURTHER ORDERED** denying Defendant's Motion for Summary Disposition of its (1) Supplemental Motion for Summary Judgment and (2) Renewed Motion to Strike the Testimony of Plaintiff. (Dkt.# 68).

**IT IS FURTHER ORDERED** granting Plaintiff's Renewed Motion for Summary Judgment on the claim of sex discrimination in violation of Title VII and denying the remainder of Plaintiff's Motion. (Dkt.# 56).

**IT IS FURTHER ORDERED** granting Defendant's Supplemental Motion for Summary Judgment on the retaliation claim and on the issue of punitive damages. (Dkt.# 60).

**IT IS FURTHER ORDERED** that the parties are to inform the court by Tuesday, December 15, 1999, whether or not they request this Court to appoint a judge to conduct a settlement conference.

**IT IS FURTHER ORDERED** that the parties shall file a Proposed Final Pretrial Order regarding the issue of damages on or before Wednesday, January 12, 2000. Motions in Limine shall be filed on the same date.